## IN THE UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

| | | |
|---|---|---|
| HELEN SCHANDOLPH, | ) | |
| | ) | |
| Plaintiff, | ) | **CV417-247** |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| BOARD OF REGENTS, OF THE | ) | JURY TRIAL REQUESTED |
| UNIVERSITY SYSTEM OF | ) | |
| GEORGIA and JEANNE MCGOWAN, | ) | |
| in her individual capacity, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT

Plaintiff Helen Schandolph ("Ms. Schandolph"), by and through the undersigned counsel and pursuant to Federal Rule of Civil Procedure 8, brings this Complaint against the Board of Regents of the University System of Georgia and Jeanne McGowan, in her individual capacity, and shows the Court as follows:

## INTRODUCTION

This is an action under Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794 *et seq.* ("Section 504"), as amended by the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §12101 *et seq.* ("ADAAA"), and under 42 U.S.C. § 1983, which provides redress for the deprivation, under color of law, of rights, privileges and immunities secured to Ms. Schandlolph under the laws of the United States, including the First Amendment to the Constitution of the United States.

## JURISDICTION AND VENUE

1.

This Court has jurisdiction over this case pursuant to 28 U.S.C. § 1331 (federal question), 28 U.S.C. §1343 (civil rights), 28 U.S.C. §§ 2201 and 2202 (declaratory judgment), and 29 U.S.C. §794a, 42 U.S.C §2000e-5(f)(3), and 42 U.S.C §2000d-7 (Rehabilitation Act).

2.

Venue is proper in this district and division pursuant to 28 U.S.C. § 1391 because Defendant is located in this judicial district and division and the violations of the U.S. Constitution and the Rehabilitation Act of which Plaintiff complains occurred in this judicial district and division. Further, this is the judicial district and division: in which the unlawful employment practice was committed, in which the employment records relevant to such practice are maintained and administered, and in which the aggrieved person would have worked but for the alleged unlawful employment practice. 42 U.S.C §2000e-5(f)(3) (Rehabilitation Act).

## PARTIES

3.

At all times relevant to this Complaint, Ms. Schandolph was a resident of Chatham County, Georgia.

4.

Ms. Schandolph was a licensed Master of Social Work beginning in September 1998. She earned her licensed in Clinical Social Work on January 26, 2002. A license in Clinical Social Work is necessary for diagnosing mental illness in Georgia.

5.

Ms. Schandolph was a Ten-Month Counselor at Armstrong State University from approximately 2011 until her forced resignation in December 2015.

6.

Ms. Schandolph is, and at all relevant times has been, an "individual with a disability" within the meaning of Section 504 of the Rehabilitation Act of 1973, as amended, 29 U.S.C. § 794, which incorporates by reference the standards of the Americans with Disabilities Act, as amended in 2008 ("ADAAA").[1]

7.

At all relevant times, Ms. Shandolph was and is a "qualified individual" as defined by 42 U.S.C. §12111(8) of the ADAAA and §504 of the Rehabilitation Act because she was able to perform the essential functions of her position as a Counselor at Armstrong State University's Counseling Center (the "Counseling Center"), with or without reasonable accommodation.

8.

Defendant Board of Regents of the University System of Georgia is an agency of the State of Georgia, and it maintains its principal office at 270 Washington Street, S.W., Atlanta, Georgia 30334. For all purposes here, Defendant Board of Regents was doing business, and continues to do business, as "Armstrong State University" in Savannah, Georgia.[2] Defendant Board of Regents

---

[1] "The standards used to determine whether [Section 504 of the Rehabilitation Act] has been violated in a complaint alleging employment discrimination under this section shall be the standards applied under title I of the Americans with Disabilities Act of 1990 (42 U.S.C. 12111 et seq.) and the provisions of sections 501 through 504, and 510, of the Americans with Disabilities Act of 1990 (42 U.S.C. 12201 to 12204 and 12210), as such sections relate to employment." 29 U.S.C. § 794(d).

[2] Upon information and belief, on January 1, 2018, Armstrong State University will transition to Armstrong Campus of Georgia Southern University.

will hereinafter be referenced as "ASU" or "Board of Regents." The Board of Regents is subject to the jurisdiction of this Court.

9.

At all times relevant to this action, ASU knew it constituted a program or activity receiving federal financial assistance as defined by the Rehabilitation Act at 29 U.S.C. §794(b).

10.

As a recipient of federal funding, Defendant Board of Regents was subject to the requirements of Section 504 of the Rehabilitation Act and the requirements of the ADAAA, including the requirement that it not subject otherwise qualified individuals with disabilities to discrimination on the basis of their disability.

11.

The Board of Regents is now, and at all times relevant hereto has been, an employer engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(b), (g) and (h) and has employed over five hundred (500) persons for the requisite duration under 42 U.S.C. § 1981a(b).

12.

Defendant Jeanne McGowan ("Defendant McGowan") is a citizen and resident of the State of Georgia. She is the Director of the Counseling Center and Ms. Schandolph's former supervisor. At all times with respect to the matters alleged in this Complaint, Defendant McGowan acted under color of law pursuant to the policy and custom of ASU and is an agent of ASU for purposes of Ms. Schandolph's claim of retaliation under the First Amendment to the U.S. Constitution. Defendant McGowan is subject to the jurisdiction of this Court and is sued in her individual capacity as to

Ms. Schandolph's claims under the First Amendment, which are brought pursuant to 42 U.S.C. §

1983.

## ADMINISTRATIVE PROCEDURE

### 13.

All conditions precedent to jurisdiction under the Rehabilitation Act have occurred. Ms.

Schandolph timely filed a charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC") on December 15, 2015, and an amended charge on March 3, 2016. See

Exhibits A and B, respectively.

### 14.

On September 15, 2016, the EEOC issued a Letter of Determination in which the EEOC

concluded that:

> Evidence of record reveals that on December 1, 2015, Charging Party notified
> Respondent of her disability and requested an accommodation, a protected
> activity. On December 4, 2015, Charging Party was issued a letter of reprimand
> and placed on a ninety-day (90-day) performance improvement plan (PIP).
> Evidence of record further indicates that approximately nine days after being
> placed on the PIP, Respondent requested Charging Party's resignation in lieu of
> immediate termination. Respondent provided no information or evidence to show
> why the Charging Party was not permitted ninety days to complete the
> performance improvement plan.
>
> Based on the record of evidence, there is reasonable cause to conclude that the
> Charging Party was subjected to disability discrimination when she was denied
> the opportunity to complete the accommodation process. Additionally,
> Charging Party was subjected to retaliation after engaging in a protected activity,
> when she was constructively discharged, in violation of the ADA, as amended.

See Exhibit C.

### 15.

Through counsel, the EEOC notified Ms. Schandolph that it would issue a "Notice of Right

to Sue," authorizing the filing of a civil action under the ADAAA within ninety (90) days of receipt

of that Notice. Ms. Schandolph has not yet received the Notice of Right to Sue but files this action under the Rehabilitation Act.

16.

This action is timely filed under the Rehabilitation Act. Defendant Board of Regents may benefit from immunity under the Eleventh Amendment to the U.S. Constitution from liability for damages under the ADAAA but remains subject to claims for injunctive and other available relief under the ADAAA and *Ex Parte Young*, 209 U.S. 123 (1908). At the appropriate time, the Complaint may be amended to add such claims.

## FACTS

### MS. SCHANDOLPH'S EMPLOYMENT WITH ARMSTRONG STATE UNIVERSITY

17.

The ASU Counseling Center for which Ms. Schandolph was employed is a service-oriented department within ASU's Division of Student Affairs, and is designed to provide individual, group, and family counseling services to enrolled undergraduate and graduate students at ASU.

18.

The Counseling Center also provides alcohol and drug assessment and education, support or therapy groups, crisis management, skill-building workshops, and classroom presentations.

19.

The Counseling Center is designed to be run by a single director and staffed by a number of licensed counselors. The Counseling Center also employs one full-time administrative assistant as well as one student worker.

20.

In November 2011, Ms. Schandolph was recruited to ASU by Mr. John Mitchell, the Director of the Counseling Center at the time. At Mr. Mitchell's urging, Ms. Schandolph accepted the position of Ten-Month Counselor.

21.

As a Ten-Month Counselor, Ms. Schandolph was tasked with providing mental health counseling to enrolled ASU students. She also was responsible for identifying and referring students who needed additional mental health services to the school's in-house psychiatrist.

22.

Ms. Schandolph was a respected clinician in the community, having served on the executive committee of the Clinical Social Workers' Association of Savannah from 2006-2012 and voted Clinical Social Worker of the Year by that organization in 2010.

23.

In September 2014, Mr. Mitchell was forced to scale back his work at the Counseling Center to care for an ill family member. As a result, with the knowledge and permission of her superiors, Ms. Schandolph began assuming Mr. Mitchell's on-call duties and performing other tasks typically performed by an administrator.

24.

In addition, Ms. Schandolph was assigned to be a member of ASU's Professional Development Committee and the University's Sexual Assault Prevention Task Force. She was also selected to obtain, and did obtain, Title IX Investigator Certification.

25.

During her tenure under the supervision of Mr. Mitchell, Ms. Schandolph received positive performance evaluations and had no disciplinary issues.

26.

Mr. Mitchell began leave under the Family and Medical Leave Act in October 2014 and was completely absent from campus following Christmas break in 2014.

27.

Mr. Mitchell retired in February 2015, and Ms. Schandolph was the only licensed clinician at the Counseling Center from March 2015 through May 2015. Her workload was overwhelming, as she became responsible for handling and addressing the most serious mental health needs of ASU's entire campus.

## MS. SCHANDOLPH IS DIAGNOSED WITH A DISABILITY

28.

On February 10, 2015, Ms. Schandolph experienced a debilitating neurological event. While in her office, Ms. Schandolph began experiencing a spinning sensation as well as numbness on the left side of her body. Ms. Schandolph exited her office and collapsed in a common area of the Counseling Center. A student worker asked Ms. Schandolph if an ambulance was needed. Ms. Schandolph responded and asked the student to call her colleague and friend Lynn Singer who worked on campus. The student worker noted that Ms. Schandolph's speech was slurred. Ms. Singer and the student worker helped Ms. Schandolph into Ms. Singer's car, and Ms. Singer drove her to the emergency room.

29.

Due to the severity of the symptoms associated with Ms. Schandolph's neurological

event, she was unable to return to work until March 9, 2015. Ms. Schandolph took leave
protected by the Family and Medical Leave Act ("FMLA") during this period.

30.

Ms. Schandolph's FMLA paperwork, which was submitted to ASU's Human Resources
Department, states that Ms. Schandolph's diagnosed condition of severe vertigo would cause
limitations for an undetermined period, would require follow-up treatment, and when
symptomatic, could impair Ms. Schandolph's ability to perform activities of daily living.

31.

Numbness that Ms. Schandolph experienced on the left side of her body after her collapse
remained even after the symptoms of vertigo temporarily subsided. To date, Ms. Schandolph
continues to experience numbness in her extremities, especially on the left side of her body, and
she still continues to experience periodic disequilibrium.

32.

Subsequently, in May 2015, Ms. Schandolph was diagnosed with Meniere's disease, a
disorder of the inner ear that causes vertigo, and other symptoms. There is no cure for the disorder,
and ongoing treatment is required to alleviate the symptoms associated with the disease.

## MS. SCHANDOLPH REPEATEDLY REQUESTS
## A REASONABLE ACCOMMODATION TO THE
## NEWLY IMPLEMENTED DISCRIMINATORY PROCEDURES

33.

As noted above, after Mr. Mitchell retired, Ms. Schandolph assumed all administrative
tasks related to the Counseling Center until the summer break starting June 1, 2015 (when her ten-
month tenure ended until the beginning of the next school year). Thus, during this period, Ms.

Schandolph became the *de facto* director of the Counseling Center, handling all duties with the exception of approving leave of Counseling Center employees.

34.

The Counseling Center was severely understaffed during this period. As the sole licensed counselor from March, after returning from leave due to her collapse, through May 2015, Ms. Schandolph was responsible for managing initial referrals, assuming responsibility for a majority of the caseloads of the Director and the twelve-month counselor, fielding all clinical emergencies, and arranging for all admissions and discharges for psychiatric hospitalizations.

35.

The International Association of Counseling Services ("IACS") has recommended standards regarding student-to-counselor ratios on the campuses of secondary educational institutions. At most, the IACS recommends a student-counselor ratio of 1:1000-1500. From March 2015 through May 2015, Ms. Schandolph labored under a ratio of 1:3500 students.

36.

On or about August 2015, Defendant Jeanne McGowan became the Director of the Counseling Center.

37.

Within a week of Defendant McGowan's employment, Ms. Schandolph informed Defendant McGowan of the neurological episode that she experienced in February 2015, as well as her diagnosis of Meniere's disease and the physical limitations of the disease, including vertigo and the lingering issue of numbness in her left extremities.

38.

Shortly after she began working at ASU, Defendant McGowan decided to change the

Counseling Center's intake process, recordkeeping and documentation standards. Prior to Defendant McGowan's arrival, counselors at the Counseling Center used a handwritten note format known as Subjective/Objective Assessment Plan ("SOAP") to take down therapy notes during sessions with patients. Defendant McGowan converted the Counseling Center practices to a different format, the Data Assessment Plan ("DAP") method.

39.

The SOAP and DAP methods require counselors to focus on different elements while assessing their patients. SOAP notes are typically formatted in a bullet-point style, while DAP notes are typically in a dictation or dialogue style. Accordingly, the DAP format typically results in lengthier therapy notes.

40.

The same month, August 2015, Defendant McGowan announced that the Counseling Center was going paperless. The paperless system, however, was never fully implemented during Ms. Schandolph's employment at ASU.

41.

On August 28, 2015, Defendant McGowan emailed Ms. Schandolph and Ruth Duran-Deffley, the other counselor at the Counseling Center, instructing them to switch from SOAP to DAP notes and to type all notes. In the same email, Defendant McGowan stated that she expected all typed notes to be completed the day of the patient's appointment or within three days after the appointment.

42.

Ms. Schandolph is right-handed and, throughout her decades-long career, has typically handwritten all therapy notes. She was able to successfully perform her job functions at the

Counseling Center from November 2011 to August 2015 by handwriting therapy notes. After Defendant McGowan instructed the counselors to type all notes, Ms. Schandolph quickly became aware that her disability prevented her from typing therapy notes in a timely manner.

43.

On August 31, 2015, Ms. Schandolph informed Defendant McGowan that due to intermittent numbness in her left hand, she was having problems transcribing (in DAP, typed format) her therapy notes. Ms. Schandolph reminded Defendant McGowan of her neurological episode that occurred in February, and explained that her problems with typing notes stemmed from the symptoms that remained after that episode. Defendant McGowan responded, "If you don't like it, you can find another job." Defendant McGowan did not discuss the possibility of accommodating Ms. Schandolph's disability.

44.

In the absence of any assistance from Defendant McGowan, in mid-September 2015, Ms. Schandolph purchased a Lifescribe Echo Smartpen, a device that converts handwritten notes to digital format and records audio.

45.

Unfortunately, the Lifescribe pen was only marginally beneficial to Ms. Schandolph, and she continued to struggle to type her therapy notes due to her disability.

46.

Over the next few months, Ms. Schandolph continued to express concern regarding her difficulty in transcribing notes to Defendant McGowan verbally during one-on-one meetings, during departmental meetings, and via email.

47.

Defendant McGowan continued to fail to engage Ms. Schandolph regarding her need for an accommodation and continued to fail to ask what could be done to address the difficulties Ms. Schandolph faced in light of her disability.   Rather, Defendant McGowan repeatedly responded that Ms. Schandolph should find another job.

## MS. SCHANDOLPH IS FORCED TO RESIGN

48.

On November 25, 2015, Defendant McGowan conducted an audit of the counselors' open and active charts.

49.

Upon review of her charts, Ms. Schandolph informed Ms. McGowan that she was trying her best to keep up with typed documentation but instead of discussing possible solutions, Ms. McGowan belittled Ms. Schandolph, rolled her eyes, sighed loudly, and recommended that it might be best for Ms. Schandolph to move on to a different job.

50.

During the audit, Defendant McGowan found Ms. Schandolph's charts non-compliant. Defendant McGowan informed Ms. Schandolph of her findings on November 30, 2015, and asked Ms. Schandolph to bring her files into compliance by December 3, 2015.

51.

On December 1, 2015, in the absence of any response to her multiple discussions with Ms. McGowan regarding her disability, and fearing for her job, Ms. Schandolph contacted Jacqueline Stepherson of ASU's Human Resources Department by email, and asked Ms. Stepherson for an

accommodation of her disability.   Ms. Schandolph specifically suggested the possibility of obtaining transcription software, which could convert spoken words into digital text.

52.

Ms. Stepherson replied to Ms. Schandolph's email and provided her with ASU's "draft" form for requesting an accommodation of a disability and providing a medical documentation form to be completed by Ms. Schandolph's treating physician.

53.

The same day, Ms. Stepherson emailed Defendant McGowan and told her that the Human Resources Department would be addressing Ms. Schandolph's request for an accommodation.

54.

On Wednesday, December 2, 2015, Ms. Schandolph emailed Defendant McGowan to inform her of an upcoming doctor's appointment where she intended to have her doctor complete the medical documentation required by ASU.   Defendant McGowan replied and asked if Ms. Schandolph intended to use vacation leave for this appointment.

55.

On Friday, December 4, 2015, Defendant McGowan presented Ms. Schandolph with a performance improvement plan ("PIP").  The PIP set out Defendant McGowan's expectations as to documentation and recordkeeping for the following 90 days, from December 8, 2015 through March 11, 2016.

56.

Ms. Schandolph did not agree with the PIP, particularly in light of the fact that Defendant McGowan had failed to respond to Ms. Schandolph's multiple requests for an accommodation with respect to documentation and recordkeeping, and given that Defendant McGowan never

entered into a dialogue with Ms. Schandolph regarding what accommodations could be possible for her disability. Nevertheless, Ms. Schandolph worked hard to bring her files into compliance with Defendant McGowan's mandates.

57.

On Thursday, December 10, 2015, Ms. Schandolph saw her medical provider and asked him to complete the paperwork ASU required before it would accommodate Ms. Schandolph's disability.

58.

On December 13, 2015, Ms. Schandolph purchased the transcription software she had been seeking from ASU in an effort to address Defendant McGowan's ongoing harassment regarding Ms. Schandolph's inability to type her notes.

59.

On Thursday, December 17, 2015, just 9 days after the 90-day PIP period began, Ms. Schandolph was called into Defendant McGowan's office. Ms. McGowan, the Human Resources Director and the Police Chief were present. Ms. Schandolph was presented with a prepared resignation letter and was given the option to resign in lieu of termination. Concerned about the loss of insurance and her ability to find another job with a termination on her record, Ms. Schandolph signed the resignation letter.

60.

Ms. Schandolph was banned from campus and was frog-marched to her automobile by the Chief of Police. Her last day at the Counseling Center was December 17, 2015. She was forced to use her vacation time through the end of December and worked from home to complete a report for the Counseling Center. Her resignation was effective January 14, 2016.

## MS. SCHANDOLPH EXPRESSES CONCERN REGARDING
## IMPROPER PRACTICES UNDER DEFENDANT MCGOWAN'S LEADERSHIP

### 61.

As discussed above, Defendant McGowan implemented a number of changes to the Counseling Center after she was hired as its Director.

### 62.

When Ms. Schandolph was notified of the plan to begin digitizing students' counseling records using an unencrypted platform of Microsoft Excel, Ms. Schandolph raised objections based on the security of the highly confidential student information in those records. Beginning in September 2015, Ms. Schandolph raised those objections with Defendant McGowan, the Title IX coordinator Deidre Denny, the USG State Auditor serving ASU's legal department, Susan Hacker, the Associate Dean of Students, Yvette Upton, and the Human Resources Department's Jacqueline Stepherson. In December, Ms. Schandolph contacted ASU's anonymous ethics hotline regarding this matter.

### 63.

Defendant McGowan also started gathering certain student data for statistical purposes. Like the counseling records, Ms. McGowan also compiled this data into a Microsoft Excel spreadsheet and included information that would be considered Personally Identifiable Information ("PII") within the meaning of the Family Educational Rights and Privacy Act ("FERPA"). FERPA provides students with the right to consent in writing before disclosure of such information. When Defendant McGowan failed to give students this right, Ms. Schandolph expressed concern directly to Defendant McGowan in September 2015 but Defendant McGowan refused to comply with the legal standards.

64.

In October 2015, a student visited the Counseling Center after having attempted to commit suicide by hanging herself and broke the noose. The textbook response to such a psychiatric emergency is to immediately have the student referred to an emergency psychiatric receiving facility for evaluation and 24-hour monitoring for a life threatening psychiatric condition. Defendant McGowan, however, allowed the student to leave the Counseling Center. Ms. Schandolph's co-worker, Ruth Duran-Deffley, expressed concern to Ms. Schandolph. Defendant McGowan refused assistance from Ms. Schandolph. Concerned with this response, Ms. Schandolph scheduled an appointment with the Title IX coordinator, Deidre Denny, who was the designee on campus to accept "ethical complaints/concerns" about campus colleagues. After scheduling the appointment, and having continuing concern over the failure of Ms. McGowan to refer the student to emergency treatment, Ms. Schandolph conducted a license search on the Georgia Secretary of State website and discovered that neither Defendant McGowan nor Ms. Duran-Deffley were listed as possessing a Georgia license. A Georgia license is required to make such an emergency referral. On October 14, 2015, Ms. Schandolph shared these concerns with Ms. Denny after which Defendant McGowan immediately began licensure efforts.

65.

On December 14, 2015, three days before termination of her employment, Ms. Schandolph also expressed concern via email regarding Counseling Center practices that she believed to be illegal and contrary to Board of Regents rules and policy, and further expressed concerns of personal denigration and discrimination to Dr. Yvette Upton, who was the Dean of Students and Associate Vice President for Student Affairs.

66.

Ms. Schandolph's concerns addressed matters of utmost public concern inasmuch as Defendant McGowan's actions affected the security and safety of hundreds of students and their personal information. Further, the licensure issue affected the quality of mental health counseling services provided to the thousands of students at ASU.

67.

No actions were taken to investigate or address the concerns Ms. Schandolph expressed to Defendant McGowan, Dr. Upton, Dr. George Lewis (Assistant Vice President of Student Affairs), Ms. Denny, Ms. Hacker and Ms. Stepherson.

68.

Defendant McGowan's actions in placing Ms. Schandolph on a 90-day performance improvement plan and terminating her thirteen days later were intentional and in retaliation for Ms. Schandolph's complaints as set forth in paragraphs 62-65, above and paragraph 69, below.

69.

Ms. Schandolph was terminated two days after submitting to the Human Resources Department her response to Ms. McGowan's PIP write-up. In her response, she referenced Ms. McGowan's intimidation and threats, causing her to fear for her job, and further referenced her complaints about the concerns she had for ensuring the counseling center's operations comported with state and federal laws and in accordance with BOR written policies.

## COUNT I

## VIOLATION OF SECTION 504 – "REGARDED AS" DISCRIMINATION

70.

Ms. Schandolph incorporates by reference all of the paragraphs herein above and below.

71.

Defendants' discharge of Plaintiff violated Section 504 of the Rehabilitation Act, as amended by the ADAAA, 42 U.S.C. §12102(1)(C) and (3), which prohibits discrimination against qualified individuals because of an actual or perceived physical impairment.

72.

Defendants intentionally, and with reckless indifference to Ms. Schandolph's rights, violated Section 504 of the Rehabilitation Act by terminating her employment based on a perceived or actual physical impairment, despite the clear prohibition of taking adverse action against otherwise qualified individuals on that basis, as set forth in the ADAAA and the Rehabilitation Act.

73.

As a direct and proximate result of Defendants' intentional discrimination, Ms. Schandolph has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, including health insurance and life insurance benefits, all in an amount to be established at trial.

74.

In addition, Defendants' actions have caused, continue to cause, and will cause Ms. Schandolph to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses all in an amount to be established at trial.

75.

Moreover, Ms. Schandolph is entitled to be reinstated to employment by Defendants and, if reinstatement is not feasible under the circumstances, she is entitled to an award of damages for future lost wages and benefits of employment.

## COUNT II

### VIOLATION OF SECTION 504 – DISABILITY DISCRIMINATION

76.

Ms. Schandolph incorporates by reference all of the paragraphs herein above and below, including without limitation the allegations of causation and damages referenced in Count I, above.

77.

At all times relevant to this Complaint, Ms. Schandolph had a disability or was regarded as having a disability within the meaning of the Rehabilitation Act and the ADAAA.

78.

At all times relevant to this Complaint, Ms. Schandolph had a condition that substantially limits one or more major life activities, including but not limited to limitations to performing manual tasks pursuant to 42 U.S.C. § 12102(2)(A).

79.

Ms. Schandolph was able to perform all of the essential functions of her position with reasonable accommodation.

80.

Defendants discriminated against Ms. Schandolph in violation of the Rehabilitation Act on the basis of her disability when it denied her requested accommodations of allowing her to handwrite her counseling notes or providing her with transcription software.    These accommodations would have allowed her to continue working at ASU while fulfilling the essential functions of her position.

81.

Defendants further violated the Rehabilitation Act when they refused to enter into the

required interactive process to determine whether the accommodations Ms. Schandolph requested would be reasonable.

82.

Defendants would not have had any significant difficulty or expense in providing Ms. Schandolph the accommodation of allowing her to handwrite notes or the accommodation of providing her with transcription software.

83.

Defendants forced Ms. Schandolph to resign ostensibly for performance issues. Ms. Schandolph was performing her role at a superior level during her employment. The real reason ASU terminated Ms. Schandolph's employment is because she had a disability.

84.

Ms. Schandolph has suffered and continues to suffer damages as a result of Defendants' unlawful actions.

85.

Defendants intentionally violated the Rehabilitation Act and acted with malice or reckless indifference to Ms. Schandolph's federally protected rights.

86.

Defendants' discharge of Ms. Schandolph violated Section 504 of the Rehabilitation Act which prohibits discrimination against qualified individuals because of disability.

87.

Defendants intentionally, with reckless indifference to Ms. Schandolph's rights, violated Section 504 of the Rehabilitation Act by terminating her employment based on a perceived or actual physical impairment, despite the clear prohibition of taking adverse action against otherwise

qualified individuals on that basis as set forth in the ADAAA and the Rehabilitation Act.

## COUNT III

### VIOLATION OF SECTION 504 – RECORD OF DISABILITY DISCRIMINATION

88.

Ms. Schandolph incorporates by reference all of the paragraphs hereinabove and below, including without limitation the allegations of causation and damages referenced in Count I, above.

89.

At the time her employment was terminated, Ms. Schandolph had a record of disability as defined by Section 504 in that she had a history of substantially limiting physical impairments.

90.

Defendants' discharge of Ms. Schandolph violated Section 504 of the Rehabilitation Act which prohibits discrimination against qualified individuals because of disability, including a record of disability.

91.

Defendants intentionally, with reckless indifference to Ms. Schandolph's rights, violated Section 504 of the Rehabilitation Act by terminating Ms. Schandolph's employment, despite the ADAAA and the Rehabilitation Act's clear prohibition of taking adverse action against otherwise qualified individuals based on a record of disability.

## COUNT IV

### VIOLATION OF SECTION 504 – DISCRIMINATION BASED ON THE FAILURE TO REASONABLY ACCOMMODATE

92.

Ms. Schandolph incorporates by reference all of the paragraphs hereinabove and below, including without limitation the allegations of causation and damages referenced in Count I, above.

93.

At all times relevant to this Complaint, Ms. Schandolph had a disability or was regarded as having a disability within the meaning of the ADAAA and the Rehabilitation Act.

94.

At all times relevant to this Complaint, Ms. Schandolph had a condition that substantially limits one or more major life activities, including but not limited to limitations to performing manual tasks pursuant to 42 U.S.C. § 12102(2)(A).

95.

Ms. Schandolph was able to perform all of the essential functions of her position with reasonable accommodation.

96.

Defendants discriminated against Ms. Schandolph in violation of the ADAAA and the Rehabilitation Act on the basis of her disability when it denied her requested accommodations of allowing her handwrite her counseling notes or providing her with transcription software.  This accommodation would have allowed her to continue working at ASU while fulfilling the essential functions of her position.

97.

Defendants further violated the ADAAA and the Rehabilitation Act when they refused to enter into the required interactive process to determine whether the accommodations Ms. Schandolph requested would be reasonable.

98.

Defendants would not have had significant difficulty or expense in providing Ms. Schandolph the accommodations of allowing her to handwrite notes or providing her with

transcription software.

99.

If Defendants would have engaged Ms. Schandolph in the interactive process required by the ADAAA and the Rehabilitation Act, her disability could have been reasonably accommodated and she would have been able to perform all the essential functions of her job.

100.

ASU forced Ms. Schandolph to resign ostensibly for performance issues. Ms. Schandolph was performing her role at a superior level during her employment. The real reason ASU fired Ms. Schandolph is because she had a disability.

101.

Ms. Schandolph has suffered and continues to suffer damages as a result of ASU's unlawful actions.

102.

Defendants intentionally violated the Rehabilitation Act and acted with malice or reckless indifference to Ms. Schandolph's federally protected rights.

## COUNT V

### VIOLATION OF SECTION 504 – RETALIATION BECAUSE OF PROTECTED ACTIVITY

103.

Ms. Schandolph incorporates by reference all of the paragraphs hereinabove and below, including without limitation the allegations damages referenced in Count I, above.

104.

Ms. Schandolph made requests for a reasonable accommodation of her disability, and the accommodations she requested would not have imposed significant hardship on Defendants.

Defendants failed and refused to provide the requested accommodations and refused to engage in the interactive process to determine the reasonableness of an accommodation.

105.

Ms. Schandolph's requests for accommodation allowing her to handwrite therapy notes and/or to use transcription software constituted her engagement in protected activity. 42 U.S.C. 12203(a). This protected activity was a determinative and motivating factor in Defendants' decision to force Ms. Schandolph to resign.

106.

By its actions set forth above, Defendants intentionally retaliated against Ms. Schandolph, who had requested a reasonable accommodation. As a direct result of Ms. Schandolph's request, Defendants forced Ms. Schandolph to resign. Ms. Schandolph has suffered and continues to suffer damages from that termination.

107.

Defendants coerced, intimidated, threatened and interfered with Ms. Schandolph in the exercise or enjoyment of these rights and on account of her having exercised or enjoyed these rights under Section 504 of the Rehabilitation Act.

108.

Defendants' actions violated the provisions of the ADAAA as incorporated in the Rehabilitation Act by interfering with Ms. Schandolph for exercising her rights under Section 504 and/or by retaliating against Ms. Schandolph because she protested Defendant's discrimination on the basis of disability.

109.

Defendants intentionally, with reckless indifference to Ms. Schandolph's rights, violated

Section 504 of the Rehabilitation Act by terminating Ms. Schandolph's employment, despite the ADAAA and the Rehabilitation Act's clear prohibition of retaliating against employees for exercising their right to reasonable accommodation or for protesting discrimination on the basis of disability.

## COUNT VI

### VIOLATION OF RIGHTS UNDER THE
### FIRST AMENDMENT TO THE UNITED STATES CONSTITUTION

110.

Ms. Schandolph incorporates by reference all of the paragraphs hereinabove and below.

111.

In raising concerns about licensing, potential FERPA violations, and other matters of serious public concern as set substantially forth in paragraphs 62-65 and 69, above, Ms. Schandolph engaged in activity that was protected from retaliation under the First Amendment to the Constitution of the United States.

112.

Ms. Schandolph's speech and expression as to these and other matters were of public concern.

113.

By virtue of their individual and concerted adverse actions, Defendants deprived Ms. Schandolph of her right to freedom of speech and expression, which rights were clearly established and secured by the First Amendment to the Constitution of the United States and protected by 42 U.S.C. § 1983.

114.

A causal connection exists between Ms. Schandolph's speech and Defendants' actions as

evidenced by, among other things, the timing of her speech or expression and the adverse actions taken by Defendants, including termination of her employment. Ms. Schandolph's speech was a substantial and motivating factor in the adverse actions taken by Defendants, including termination of her employment.

115.

Defendants' actions were committed under color of law.

116.

As a direct and proximate result of Defendants' intentional retaliation against Ms. Schandolph's speech and expression, Ms. Schandolph has suffered out of pocket losses and has been deprived of job-related economic benefits, including income in the form of wages and other job-related benefits, including health insurance and life insurance benefits, all in an amount to be established at trial.

117.

In addition, Defendants actions have caused, continue to cause, and will cause Ms. Schandolph to suffer damages for emotional distress, mental anguish, loss of enjoyment of life, and other non-pecuniary losses all in an amount to be established at trial.

118.

Ms. Schandolph is entitled to be reinstated to employment by Defendants and, if reinstatement is not feasible under the circumstances, she is entitled to an award of damages for future lost wages and benefits of employment.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays:

a)      That her claims be tried before a jury;

b)      That Judgment be entered against Defendants for their violations of the Rehabilitation Act and Ms. Schandolph's rights under the First Amendment to the United States Constitution;

c)      For an Order requiring Defendants to make Ms. Schandolph whole by reimbursing her for out-of-pocket losses as well as lost wages in an amount equal to the sum of any wages, salary, employment benefits or other compensation or benefits denied or lost as a result of Defendants' violations of the Rehabilitation Act and the First Amendment to the Constitution, including the cost of replacement health insurance benefits, retirement benefits and the loss of life insurance benefits for her beneficiaries, together with interest thereon;

d)      For an Order requiring Defendants to compensate Ms. Schandolph for her mental and emotional distress damages suffered as a result of Defendants' violations of the Rehabilitation Act and the First Amendment to the Constitution;

e)      That she be awarded punitive damages against Defendant McGowan in an amount determined by a jury;

f)      That the Court order the reinstatement of Ms. Schandolph to her former position or provide her front pay in lieu of reinstatement;

g)      For an Order granting Ms. Schandolph a reasonable attorney's fee and reasonable expert witness fees together with any and all other costs associated with this action, as provided by law;

h)      That Ms. Schandolph be awarded prejudgment and post-judgment interest;

i)      For a permanent injunction enjoining Defendants and their successors, deputies, agents, employees, attorneys, and those acting in concert with them, from engaging

in any employment practice or policy which interferes with, or fails to fulfill, the Rehabilitation Act rights or First Amendment rights of Board of Regent employees;

j)      For an order requiring Defendants and supervisory employees to complete training regarding their employees' rights under the Rehabilitation Act and the duty to provide reasonable accommodation under the Rehabilitation Act; and

k)      For such further relief as necessary to fulfill the purposes of the Rehabilitation Act or the First Amendment to the Constitution, or as the Court otherwise deems just and proper.

RESPECTFULLY SUBMITTED, this 15th day of December 2017.


                                        */s/ S. Wesley Woolf*
                                        S. WESLEY WOOLF
                                        Georgia Bar No. 776175
                                        *Attorney for Plaintiff*

WOOLF LAW FIRM
408 East Bay Street
Savannah, Georgia 31401
T: (912) 201-3696
F: (912) 236-1884
woolf@woolflawfirm.com