IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

U.S. DIST... CO...
SAVAN... DIV.
NOV 13 PM 12: 43
CLER...
SO.D...T OF G...

HELEN SCHANDOLPH,               )
                                )
        Plaintiff,              )
                                )
v.                              )        CASE NO. CV417-247
                                )
BOARD OF REGENTS OF THE         )
UNIVERSITY SYSTEM OF GEORGIA,   )
and JEANNE MCGOWAN, in her      )
individual capacity,            )
                                )
        Defendants.             )
_____)

## O R D E R

Before the Court is Defendants' Motion for Summary Judgment
(Doc. 45) and Defendants' Motion to Strike or in the Alternative
Notice of Objection and Brief in Support Thereof (Doc. 65). For
the following reasons, Defendants' Motion for Summary Judgment
(Doc. 45) is **GRANTED** and Defendants' Motion to Strike or in the
Alternative Notice of Objection and Brief in Support Thereof (Doc.
65) is **DENIED**.[1]

_____

[1] In their Motion to Strike, Defendants contend that Plaintiff's
response to Defendants' Notice of Objection to Evidence was not
timely under Southern District of Georgia Local Rule 7.5 and
exceeds the brief length set forth in Southern District of Georgia
Local Rule 7.1. (Doc. 65 at 2.) Defendants, therefore, request
that this Court strike Plaintiff's responsive brief. The Court
finds this to be unnecessary and finds that a reply brief from
Defendants is also unnecessary. Accordingly, Defendants' Motion to
Strike or in the Alternative Notice of Objection and Brief in
Support Thereof (Doc. 65) is **DENIED**.

## BACKGROUND

In this case, Plaintiff Helen Schandolph claims that Defendants discriminated against her when she was forced to resign in lieu of being terminated.[2] Prior to her forced resignation, Plaintiff was employed by Defendant Board of Regents of the University System of Georgia ("BOR") at Armstrong State University (the "University") as a Counselor in the University Counseling Center ("UCC"). (Doc. 52, Attach. 1 at ¶ 1.)

In February 2015, Plaintiff suffered a stroke-like incident. (Doc. 52, Attach. 3 at 32.) Plaintiff was later diagnosed in May with Meniere's disease. (Doc. 52, Attach. 3 at 32.) Plaintiff was out of work from February 10, 2015 until March 9, 2015. (Id.) Plaintiff had subsequent Meniere's episodes in July 2015 and October 2015. (Id. at 34.) Plaintiff did not request accommodation after these episodes. (Id.) These episodes involve a spinning sensation that causes Plaintiff to be unable to walk, drive, or otherwise conduct activities. (Id. at 35.) Additionally, Plaintiff has continued numbness in her left hand. (Id. at 36.) Plaintiff has also been diagnosed with spondylosis, which is treated by regular facet injections. (Id. at 38.)

---

[2] For the purposes of ruling on Defendants' Motion for Summary Judgment, the Court construes the facts in the light most favorable to Plaintiff. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-88, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986).

On or about August 3, 2015, Defendant Jeanne McGowan became the Director of the UCC. (Id. at ¶ 3.) Defendant McGowan reported to Georj Lewis, Ph.D., Vice President of Student Affairs. (Id. at ¶ 4.) In August, Defendant McGowan implemented many changes in the intake process, recordkeeping, and documentation standards at the UCC. (Id. at ¶ 7.) Some of the changes included switching from a therapy note format known as Subjective/Objective Assessment Plan ("SOAP") to the Data Assessment Plan ("DAP") method and requiring all therapy notes to be typed. (Doc. 32 at 11; Doc. 52, Attach. 3 at 45.) On August 28, 2015, Defendant McGowan sent an e-mail to the staff at the UCC about the changes and included links and information on the changes, DAP note writing, and outlined her expectation that all paperwork should be completed the same day as an appointment or within three days at the latest. (Doc. 52, Attach. 3 at 167.) During the months of August, September, October, and November of 2015, Defendant McGowan discussed the changes in department meetings and provided advice on implementation. (Doc. 52, Attach. 3 at 48.) Defendant McGowan conducted one-on-one meetings with Plaintiff and provided Plaintiff with materials in regards to taking DAP notes, clinical documentation, and recordkeeping. (Id.)

After Defendant McGowan instructed the counselors to type all notes, Plaintiff became aware that her disability prevented her from timely typing her notes. (Doc. 32 at 12.) Plaintiff claims

she told Defendant McGowan about "the neurological episode I had" the first time that the two met one-on-one on August 31, 2015. (Doc. 52, Attach. 3 at 37.) During that meeting, Plaintiff informed Defendant McGowan that due to intermittent numbness in her left hand, she was having problems typing her therapy notes in the DAP format and told Defendant McGowan that her issues stemmed from her neurological episode that occurred in February. (Doc. 32 at 12; Doc. 52, Attach. 3 at 46.) Plaintiff did not request an accommodation at this meeting. (Doc. 52, Attach. 3 at 37.) The next time that Plaintiff brought up her Meniere's condition to Defendant McGowan was in October 2015. (Id.)

In mid-September 2015, Plaintiff purchased a Lifescribe Echo Smartpen, a device that converts handwritten notes to digital format and records audio. (Doc. 32 at 12.) Plaintiff brought the smartpen to some meetings with Defendant McGowan. (Doc. 52, Attach. 4 at 32.) Defendant McGowan understood the smartpen to be a tool used by Plaintiff to be more efficient and stay on top of her work. (Id. at 33.) Plaintiff continued to express concern to Defendant McGowan during their one-on-one meetings in September, October, and November that that she was having difficulty transcribing her notes. (Doc. 52, Attach. 3 at 47.) Plaintiff, however, did not request any accommodations at those times. (Id. at 37.)

On October 19, 2015, Plaintiff e-mailed Defendant McGowan directly with the subject line of the e-mail reading "Meniere's

Episode," and informed Defendant McGowan that she had experienced an episode at 3:47 a.m. that morning, described it as a "disorder" with which she was diagnosed, and informed Defendant McGowan that she was not coming in to the office. (Doc. 52, Attach. 14 at 1.) Defendant McGowan told Plaintiff to "feel better" and informed her that they would cancel Plaintiff's appointments. (Id.) Plaintiff did not ask for reasonable accommodations at this time or refer to her condition as a disability. (Doc. 52, Attach. 3 at 37.)

On the morning of November 19, 2015 around 9:20 a.m., Plaintiff was informed by her doctor's office that her appointment originally scheduled for November 25 would have to be rescheduled because the office would be closed that day due to the Thanksgiving holiday. (Doc. 52, Attach. 1 at ¶ 14; Doc. 52, Attach. 18.) Her doctor's office informed her that if she wanted to have her monthly injections, she would need to come in that day. (Id.) Plaintiff had a 10:00 a.m. counseling session scheduled and felt that it was too late to cancel that session, but informed the administrative assistant, Susan Carol, that she needed the remainder of her appointments that day to be rescheduled. (Id.) Plaintiff subsequently requested leave in the ADP system and sent Defendant McGowan an e-mail about her urgent leave request. (Id.; Doc. 52, Attach. 18.) Defendant McGowan sent an e-mail to Plaintiff instructing her to follow the process for scheduling time off and further instructing Plaintiff to inform Defendant McGowan of an

absence first before sharing with other office staff. (Doc. 52, Attach. 18.) The two exchanged e-mails regarding the absence including an e-mail from Defendant McGowan in which she states that she does review employees' "time away from the office" as a part of a "comprehensive evaluation" as "time away from the office can be an impact on the overall function of the UCC." (Id.)

On November 25, 2015, Defendant McGowan conducted an audit on the counselors' open and active charts. (Doc. 52, Attach. 1 at ¶ 14.) On that same day, Defendant McGowan e-mailed Lewis regarding Plaintiff's work performance and stated that, after reviewing charts and documentation, she was planning on writing Plaintiff up and that she would like to discuss the write-up with Human Resources ("HR"). (Doc. 52, Attach. 4 at 111.) She subsequently e-mailed Lewis about possibly revoking a permission with Plaintiff's Tuition Assistant Program ("TAP"). (Id. at 112.) Lewis replied to Defendant McGowan the same day, expressed concern about revoking TAP and stated that HR needed to be engaged "ASAP." (Id. at 113.) Defendant McGowan responded that she was requesting a meeting with HR that day. (Id. at 114.)

Subsequently, on November 30, 2015, Defendant McGowan informed Plaintiff that she found Plaintiff's charts non-compliant and asked Plaintiff to bring her files into compliance by December 3, 2015. (Doc. 32 at 13; Doc. 52, Attach. 1 at ¶ 14.) On the same day, Defendant McGowan followed up with Lewis and informed him

that she had a meeting scheduled for the following day, December 1, with Jacqueline Stepherson, Assistant Director of Human Resources, and Rebecca Carroll, Director of Human Resources, to "review the numerous concerns I have pertaining to documentation of clinical work." (Doc. 45, Attach. 10 at 58.) Defendant McGowan goes on to include some of the issues with documentation that she found, including Plaintiff's lack of clinical documentation, failure to use the documentation standards that were established in August, and continuing insubordination issues. (Doc. 52, Attach. 1 at ¶ 25; Doc. 45, Attach. 10 at 58.)

On December 1, 2015, Defendant McGowan met with Stepherson and Carroll regarding Plaintiff's performance issues. (Doc. 52, Attach. 1 at ¶ 26.) On the same day, Plaintiff e-mailed Stepherson and formally requested that she receive voice transcription software, encryption software that allows her to transcribe treatment notes without violating the confidentiality requirements of HIPAA, permission to allow her notes to reflect general information instead of details of students' issues, and a reduction in her caseload to a manageable level. (Doc. 52, Attach. 3 at 173.) Stepherson responded the same day to Plaintiff and sent her the University's ADA policy, the medical certification form that need to be completed by Plaintiff's physician, and Plaintiff's job description to be referenced by Plaintiff's physician in accessing limitations. (Id.)

Additionally, also on December 1, 2015, Stepherson e-mailed Defendant McGowan the progressive discipline guide "per our conversation" and also stated that Plaintiff had reached out to her for an ADA accommodation. (Doc. 52, Attach. 4 at 107.) Stepherson further stated that "[t]his action goes beyond the supervisor accommodating a request. This is a formal request and will go through our formal process. You do not need to have any further conversations regarding accommodations." (Id.) Defendant McGowan responded that she would not address the accommodations and asked whether there was a time to meet and discuss "the write up and get feedback on the conversation." (Id. at 108.)

Subsequently, on December 4, 2015, Defendant McGowan issued a written reprimand to Plaintiff due to "negligence in adhering to clinical documentation and record keeping standards." (Doc. 45, Attach. 10 at 59.) The written reprimand stated that clinical documentation standards were discussed during departmental meetings on August 17, 2015 and August 25, 2015 and during individual meetings on August 26, 2015, August 31, 2015, September 3, 2015, September 8, 2015 and on September 24, 2015. (Id.) The written reprimand stated that during the audit of charts on November 25, 2015, Defendant McGowan found "34 counts of neglect, complete absence of a clinical progress note for provided services, was found over 28 charts between 8/31/2015 and 11/17/2015." (Id.) Other issues were found in the audit, including a missing record

of consent to treat in one chart, seven charts lacking the requiring documentation for referral of a student for a psychiatric evaluation, and general disorganization of the charts were also discussed in the reprimand. (Id.) Finally, the reprimand stated that further actions could result in further disciplinary action up to, and including, dismissal and placed Plaintiff on a ninety-day performance improvement plan. (Id. at 60.)

On December 6, 2015, Plaintiff e-mailed Stepherson with the subject line reading "reasonable accommodations." (Doc. 52, Attach. 21.) In the e-mail, Plaintiff informs Stepherson that, due to a consultation with her malpractice liability insurance's legal department, she was withdrawing her request "for the accommodation of software encryption" but stated that she was willing to purchase the transcription software if given approval to help mitigate the limitations of her disability. (Id.) She goes on to state that "[o]n numerous occasions, I informed my supervisor that I was 'doing the best that I could' to comply. However, due to the lingering effects from the stroke, perhaps she interpreted my **inability** to comply (type and perform administrative tasks) with **refusal** to comply (**insubordination**)." (Id. (emphasis in original).) She also stated that she had an appointment scheduled with her treatment provider and expected to file ADA documentation. (Id.)

On Monday, December 7, 2015, Defendant McGowan e-mailed Plaintiff about "the tracking" that was originally due the previous Friday at 5 p.m. and of which Plaintiff was given an extension until Monday at lunch. (Doc. 45, Attach. 10 at 61.) The e-mail goes on to state that "at 5pm today you informed me that you will not have it until 8 pm. I have accepted 2 requests for changed deadlines from the original. I am setting the final deadline for this task on Wed Dec 9 by noon." (Id.) A few days later, on December 10, 2015, Defendant McGowan e-mailed Plaintiff and stated that the November tracking was not completed accurately and requested Plaintiff revise and resubmit the form no later than December 16, 2015 at 5 p.m. (Id. at 62.)

On December 14, 2015, Plaintiff e-mailed Defendant McGowan that she was "looking forward to reviewing my charts after the audit on Friday" and noted that while the majority of her progress notes are in DAP format, some of the notes from the new students she saw last week were not typed. (Id. at 63.) Plaintiff also stated that she wanted to "clear up whatever issues that remain on the monthly spreadsheet" so that she could resubmit it by the end of the day. (Id.) In this e-mail, Plaintiff also stated that "[a]s you may or may not be aware, I officially requested reasonable accommodations December 1st, 2015 so that may take some time. Meanwhile I purchased Dragon Software for myself so that I may fully comply with all standards." (Id.)

Defendant McGowan responded to this e-mail and stated that the feedback on the charts would be provided the following Monday at noon, but that any concerns with cases would be reviewed during the one-on-one meetings or sooner if needed. (Id.) Plaintiff replied that she wanted her charts returned ASAP so that she could type the progress notes. (Id.) In response, Defendant McGowan stated that

> As discussed, of primary importance is the reflection of treatment in a note within 24 72 hours. At this time, you are doing some typed and some handwritten. I have accepted the handwritten until they can be transcribed. Since the audit states "typed" those handwritten notes were not in compliance. We can circle back to make sure you are getting them typed. We can continue to discuss any issues during our 1:1 sessions. All charts from 12/11 until 12/17 will be submitted on 12/18 at 3pm.

(Id.)

The following day, on December 15, 2015, Plaintiff left work because she was sick. (Doc. 52, Attach. 1 at 20-21.) Plaintiff and Defendants appear to disagree on whether Plaintiff provided notification to Defendant McGowan that she was leaving the office. (Id.) However, in an e-mail dated the same day, Defendant McGowan told Plaintiff that she was concerned about Plaintiff's whereabouts as Plaintiff was in the office at 8:15 a.m. and then left without notice. (Doc. 52, Attach. 3 at 196.) Plaintiff responded to Defendant McGowan that "I am sorry I must not have

made it clear that I was leaving this morning when I walked by you" and stated that she went to the doctor and would provide Defendant McGowan with the documentation. (Doc. 52, Attach. 23; Doc. 52, Attach. 3 at 198.) On the same day, Plaintiff delivered a response to the written reprimand to Rebecca Carroll. (Doc. 52, Attach. 3 at 68.) In the response, Plaintiff admits that when she gave her charts to Defendant McGowan for the audit, the charts did not contain the handwritten progress notes, and that the notes had been completed but she removed them because they were not typed. (Doc. 52, Attach. 3 at 238.) Plaintiff also admits that there may have been a missing consent to treatment form in a chart that she inherited from another clinician. (Id.) Plaintiff goes on to state that her documentation lag was due to the numbness in her left hand from the stroke in February and that she was having trouble keeping up with typing the notes in the newly required DAP method. (Id.) Plaintiff alleges that Defendant McGowan threatened her job and failed to "enter a dialogue with me regarding any accommodations." (Id.)

Also on December 15, 2015, Defendant McGowan e-mailed Stepherson and stated that the following issues arose since Defendant McGowan provided the written reprimand to Plaintiff: (1) Plaintiff, during an interview with a candidate on December 7, 2015, asked about the age of the child of the interviewee, (2) Plaintiff required numerous deadline extensions to complete work,

(3) Plaintiff allegedly misconstrued statements in a candidate evaluation form, (4) Plaintiff left work without notice on December 15, 2015 and was unable to be contacted by Defendant McGowan on three attempts, (5) after chart audits on December 7, 2015, Defendant McGowan had ethical concerns about Plaintiff's interactions with students and, during a follow-up discussion, Plaintiff expressed an intent to not see students for care because it was stressful, and (6) Plaintiff left the office early on December 7, 2015 and did not enter the time in ADP and left a scheduled student waiting for an appointment. (Doc. 52, Attach. 6 at 28.)

On December 16, 2015, Defendant McGowan met with Stepherson and Carroll and discussed the same conduct that was sent in the e-mail to Stepherson. (Doc. 52, Attach. 1 at ¶ 41.) Defendant McGowan also informed Stepherson and Carroll that Plaintiff left confidential patient charts on the receptionist desk, which is open to the public, while the receptionist was away from the office that day and that Plaintiff referred a student to a community health provider because, in Plaintiff's view, the UCC did not uphold confidentiality. (Id.) On December 17, 2015, Plaintiff was given the offer to resign in lieu of termination due to Plaintiff's alleged poor performance. (Doc. 52, Attach. 4 at 47; Doc. 52, Attach. 7 at 7-8.) On December 17, 2015, Plaintiff signed a letter of resignation stating that her last day in the office would be

December 17, 2015 and her last day of employment would be January 14, 2016. (Doc. 52, Attach. 3 at 199.) Plaintiff would be taking vacation time between those two dates. (Id.) On the same date, Defendant McGowan accepted Plaintiff's resignation. (Id. at 200.)

In addition to the disability concerns Plaintiff had, Plaintiff expressed concerns about Defendant McGowan's leadership and practices that Plaintiff believed to be improper. (Doc. 32 at 16.) On August 17, 2015, Plaintiff submitted a complaint through the confidential hotline alleging that Defendant McGowan was "making policy changes that are dangerous and puts the school at a liability" including the introduction of a 15-minute counseling session and told staff that they could only take a 30-minute lunch. (Doc. 52, Attach. 4 at 95.) The case action summary states that Defendant McGowan rescinded her statement about half-hour lunch periods and also stated that, per the University's employee handbook, the standard lunch period is 45 minutes. (Id. at 97.)

In September 2015, Plaintiff raised objections to the practice of digitizing students' counseling records on Microsoft Excel, an unencrypted program. (Doc. 52, Attach. 3 at 56.) In an e-mail to Defendant McGowan, Plaintiff shared a concern about using students' personal identifying information ("PII") on jump or hard drives. (Doc. 45, Attach. 10 at 57.) In response, Defendant McGowan informed Plaintiff that she consulted with Susan Hacker, auditing, and Angel Howard, with IT security, and that she was advised that

"having only a name and no other piece of identifying information"
is directory information and not considered PII. (Id.) Defendant
McGowan also stated that she asked for additional protections and
that Howard was working to implement more secure options. (Id.)
Plaintiff e-mailed Jacqueline Stepherson on September 10, 2015,
and stated that she had discussed her privacy concerns with her
supervisor [Defendant McGowan] and provided the same attachments
regarding her concerns with the handling of students' PII. (Doc.
52, Attach. 25.) Plaintiff also stated that she met with Defendant
McGowan and the two "discussed communications styles and how I was
trying to adjust and asked what I could do to improve this and she
provided very helpful feedback." (Id.)

On December 14, 2015, Plaintiff made another report to the
confidential ethics hotline and reported that Defendant McGowan
had previously placed a question on the counseling intake form
regarding students' sexuality and that, while the legal department
made Defendant McGowan remove the question, Defendant McGowan
still instructed the counselors to ask about students' sexuality
and religion. (Doc. 52, Attach. 4 at 102-103.) Plaintiff also
complained that Defendant McGowan required sensitive personal and
confidential health information to be included on a non-encrypted
Excel spreadsheet and that Defendant McGowan did not have a Georgia
license to practice. (Id. at 103.) In the complaint, Plaintiff
stated that she reported Defendant McGowan's lack of licensure to

Deidre Denny, the Title IX coordinator, after which Defendant McGowan applied for a license in October 2015. (Id. at 104.)

After filing a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and receiving Notice of Right to Sue, Plaintiff filed suit in this Court. In her amended complaint, Plaintiff brings claims for disability discrimination, retaliation, and failure to accommodate under the Rehabilitation Act and the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. §12101 et seq. ("ADAAA"), as well as a claim pursuant to 42 U.S.C. § 1983 for violation of her First Amendment rights. The claims under the ADAAA and the Rehabilitation Act are brought against both Defendant BOR and Defendant McGowan, in her official capacity. (Doc. 32 at 6.) The First Amendment claims are brought against Defendant McGowan in her individual capacity. (Id.)

In their Motion for Summary Judgment, Defendants argue that Plaintiff's ADAAA claims against Defendant BOR are barred by the Eleventh Amendment immunity and that the ADAAA and Rehabilitation Act claims against Defendant McGowan fail because neither statutory regime provides for individual liability. (Doc. 45, Attach. 1 at 2.) In addition, Defendants contend that Plaintiff's ADAAA and Rehabilitation claims for discrimination, failure to accommodate, and retaliation fail due to Plaintiff's inability to show that Defendants' legitimate, non-discriminatory, non-retaliatory reasons for the employment decisions were pretextual.

(Id. at 2-3.) Finally, Defendants argue that Plaintiff's § 1983 claims are not viable as the claims against Defendant BOR and Defendant McGowan, in her official capacity, are barred by Eleventh Amendment immunity and the claims against Defendant McGowan, in her individual capacity, are barred by qualified immunity. (Id. at 3.) Additionally, Defendants claim that even if the § 1983 claims were not barred, the claim fails because Plaintiff cannot produce evidence to establish a genuine issue of material fact. (Id.)

## ANALYSIS

### I.  SUMMARY JUDGMENT STANDARD

According to Fed. R. Civ. P. 56(a), "[a] party may move for summary judgment, identifying each claim or defense—or the part of each claim of defense—on which summary judgment is sought." Such a motion must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Id. The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587, 106 S. Ct. at 1356 (quoting Fed. R. Civ. P. 56 advisory committee notes).

Summary judgment is appropriate when the nonmovant "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S.

17

317, 322, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986). The substantive law governing the action determines whether an element is essential. DeLong Equip. Co. v. Wash. Mills Abrasive Co., 887 F.2d 1499, 1505 (11th Cir. 1989).

As the Supreme Court explained:

> [A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Celotex, 477 U.S. at 323, 106 S. Ct. at 2553. The burden then shifts to the nonmovant to establish, by going beyond the pleadings, that there is a genuine issue as to facts that are material to the nonmovant's case. Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991). The Court must review the evidence and all reasonable factual inferences arising from it in the light most favorable to the nonmovant. Matsushita, 475 U.S. at 587-88, 106 S. Ct. at 1356. However, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Id., 475 U.S. at 586, 106 S. Ct. at 1356. A mere "scintilla" of evidence, or simply conclusory allegations, will not suffice. See, e.g., Tidwell v. Carter Prods., 135 F.3d 1422, 1425 (11th Cir. 1998). Nevertheless, where a reasonable fact finder may "draw more than one inference from the facts, and that

inference creates a genuine issue of material fact, then the Court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989).

II.  PLAINTIFF'S ADAAA AND REHABILITATION ACT CLAIMS

A. The Application of Eleventh Amendment Immunity to Plaintiff's Claims under the ADAAA and the Rehabilitation Act

Defendants argue that Plaintiff's ADAAA claims against Defendant BOR are barred by the Eleventh Amendment and that the ADAAA and Rehabilitation Act claims against Defendant McGowan fail because neither statutory regime provides for individual liability. (Doc. 45, Attach. 1 at 2.) In response, Plaintiff concedes that "any claim for damages against these Defendants is barred by the Eleventh Amendment to the Constitution of the United States" and that "neither the ADAAA nor the Rehabilitation Act provides for individual liability, only for employer liability." (Doc. 52, Attach. 2 at 6.) Nevertheless, Plaintiff contends that Defendants' motion on immunity grounds is "without effect" because the amended complaint does not "seek such liability." (Id.)

The Court disagrees, in part. Plaintiff's amended complaint clearly seeks damages under the ADAAA and the Rehabilitation Act. (Doc. 32 at 28 (requesting out-of-pocket losses, lost wages and other amounts including replacement health insurance benefits, retirement benefits, and other employment benefits as well as compensation for mental and emotional distress).) However,

Plaintiff also seeks injunctive relief in that Plaintiff seeks reinstatement to her former position as well as an order requiring Defendants to complete training regarding employees' rights under the Rehabilitation Act and the ADAAA. (Id. at 29.)

First, Plaintiff's claims for damages under the ADAAA against Defendants are barred by the Eleventh Amendment. Bd. of Trustees of Univ. of Alabama v. Garrett, 531 U.S. 356, 374, 121 S. Ct. 955, 968, 148 L. Ed. 2d 866 (2001); Rizo v. Alabama Dep't of Human Res., 228 F. App'x 832, 835 (11th Cir. 2007). Plaintiff states in her amended complaint that Defendant BOR and Defendant McGowan, in her official capacity, remain subject to claims for injunctive relief pursuant to Ex Parte Young, 209 U.S. 123 (1908). (Doc. 32 at 6.)

The Court agrees that Defendant McGowan, in her official capacity, remains subject to suit under the ADAAA for the injunctive relief claims. See Garrett, 531 U.S. at 374, 121 S. Ct. at 968; Fedorov v. Bd. of Regents for Univ. of Georgia, 194 F. Supp. 2d 1378, 1386 (S.D. Ga. 2002) (stating that, under the Ex parte Young doctrine, a plaintiff may receive prospective equitable relief against state officers acting in their official capacity). However, the Court finds that the Eleventh Amendment completely bars Plaintiff's ADAAA claims against Defendant BOR and Ex parte Young does not act to save the claims. Puerto Rico Aqueduct & Sewer Auth. v. Metcalf & Eddy, Inc., 506 U.S. 139, 146, 113 S. Ct. 684, 688, 121 L. Ed. 2d 605 (1993) (stating that the Ex

parte Young doctrine is narrow and "and has no application in suits against the States and their agencies"); Ward v. Georgia Dep't of Human Res., No. 1:04-CV-3424-RLV-CCH, 2006 WL 8431779, at *11 (N.D. Ga. Jan. 27, 2006), report and recommendation adopted, No. 1:04-CV-3424-RLV, 2006 WL 8431868 (N.D. Ga. Feb. 21, 2006) ("Young functions as a narrow exception to the general rule of state immunity and permits suit only against a state official directly for prospective equitable relief to end a continuing violation of federal law.") (citing Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health & Rehab. Servs., 225 F.3d 1208, 1219 (11th Cir. 2000)). Accordingly, the Court finds that Defendant BOR is entitled to summary judgment on Plaintiff's ADAAA claims and that Defendant McGowan is entitled to summary judgment on the ADAAA claims to the extent that the claims seek damages.

Second, Plaintiff concedes that neither the ADAAA nor the Rehabilitation Act provides for individual liability. (Doc. 52, Attach. 2 at 6.) From this Court's review, however, it does not appear that Plaintiff sought any individual liability against Defendant McGowan in the ADAAA or Rehabilitation Act claims. (See Doc. 32 at 6 ("All available relief, including damages and injunctive relief, is sought from both Defendant Board of Regents and Defendant Jeanne McGowan in her official capacity under the Rehabilitation Act and the ADAAA.").) Nevertheless, to the extent that Plaintiff asserted any ADAAA or Rehabilitation Act claims

21

against Defendant McGowan in her individual capacity, Defendant McGowan is entitled to summary judgment.

## B. Plaintiff's Claims of Discrimination under the ADAAA and the Rehabilitation Act

A plaintiff can make out a claim for unlawful discrimination based on disability under numerous theories. For failure to accommodate claims, an employer unlawfully discriminates against a qualified individual with a disability when the employer fails to provide reasonable accommodations for the disability—unless doing so would impose undue hardship on the employer. Lucas v. W.W. Grainger, Inc., 257 F.3d 1249, 1255 (11th Cir. 2001). For discriminatory termination, a plaintiff must "establish evidence upon which a reasonable factfinder could infer that she was terminated 'because of [her] disability.' " Munoz v. Selig Enterprises, Inc., No. 1:16-CV-03924-MHCJCF, 2018 WL 9440321, at *8 (N.D. Ga. July 3, 2018), report and recommendation adopted as modified, No. 1:16-CV-3924-MHC, 2018 WL 9441063 (N.D. Ga. Sept. 20, 2018) (quoting Mazzeo v. Color Resolutions Int'l, LLC, 746 F.3d 1264, 1268 (11th Cir. 2014)). Defendants have moved for summary judgment as to both claims.

### 1. Failure to Accommodate

Defendants argue that, even if Plaintiff makes out a prima facie case on the first two prongs, Plaintiff cannot show that she was discriminated against by Defendants' failure to provide a

reasonable accommodation. Defendants largely contend that Defendant McGowan was unaware of Plaintiff's disability until she made her formal request for accommodations on December 1, 2015 and that, prior to that time, Defendants were unaware that Plaintiff desired accommodations. (Doc. 45, Attach. 1 at 16-19.)

To state a prima facie claim for failure to accommodate, the plaintiff must show that (1) she is disabled, (2) she is a qualified individual, and (3) that she was discriminated against by defendant's failure to provide a reasonable accommodation. Lucas, 257 F.3d at 1255. "While employers are required to reasonably accommodate disabled employees who are otherwise qualified, that duty 'is not triggered unless a specific demand for an accommodation has been made.' " Dantzler v. Georgia Ports Auth., No. CV417-062, 2018 WL 7291377, at *5 (S.D. Ga. Nov. 29, 2018), report and recommendation adopted sub nom. Dantzler v. Georgia Port Auth., No. CV417-062, 2019 WL 157729 (S.D. Ga. Jan. 10, 2019) (quoting Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1363 (11th Cir. 1999)). Although the Eleventh Circuit has not determined precisely what form the request for reasonable accommodation must take, it has indicated in an unpublished opinion that "for a demand to be specific enough to trigger the duty to provide a reasonable accommodation, the defendant must have enough information to know of both the disability and desire for an accommodation, or circumstances must at least be sufficient to

cause a reasonable [employer] to make appropriate inquiries about the possible need for an accommodation." United States v. Hialeah Hous. Auth., 418 F. App'x 872, 876 (11th Cir. 2011).

In response to Defendants' motion, Plaintiff contends that Defendants had knowledge of Plaintiff's impairment and its consequences for her performance and that Plaintiff provided her employer with enough information such that the University knew of her disability and desire for an accommodation. (Doc. 52, Attach. 2 at 25.) Specifically, Plaintiff states that she identified a specific mechanical accommodation, a Livescribe pen, and purchased it herself and that, while trying to use the pen over the next two months, she continued to tell Defendant McGowan that she was having issues transcribing her notes. (Id.) Plaintiff also states that she made a general request that her workload be reduced. (Id.) Plaintiff contends that it is disingenuous for Defendant McGowan to claim that she was not aware of Plaintiff's request for accommodations until December 1, 2015, when Plaintiff made her formal request by e-mail to Stepherson. (Id.)

The Court finds no evidence upon which a factfinder could reasonably infer that Defendants failed to accommodate Plaintiff's impairments. It appears from Plaintiff's response brief that the accommodations she identified and sought, and was allegedly not provided, was a "Livescribe" pen and a general request that her workload be reduced to a manageable level. (Doc. 52, Attach. 2 at

25.) There is no evidence in the record that Plaintiff requested these accommodations or was denied them. In regards to the Livescribe pen, Plaintiff's own declaration states only that Defendant McGowan was aware of her difficulty in transcribing notes because of her "awareness of my Livescribe pen purchased by me in [sic] September 17, 2015 in an attempt to self-accommodate. . . ." (Doc. 52, Attach. 9 at ¶ 37.) Plaintiff does not allege that she ever requested this pen, or similar tools, from Defendant McGowan or that Defendant McGowan denied her such tools. Plaintiff also fails to cite to any evidence in the record that she requested a more manageable workload from Defendant McGowan prior to her formal request on December 1, 2015 to Stepherson. Thus, even if Plaintiff's discussions with Defendant McGowan during the one-on-one sessions gave Defendant McGowan enough information of Plaintiff's impairments, the Court is not persuaded that these conversations were sufficient to notify Defendant McGowan of Plaintiff's desire for an accommodation or of Plaintiff's desire for the "specifically identified" accommodations listed in Plaintiff's response brief. Plaintiff admits in her deposition that she never asked for an accommodation either outside of or during these one-on-one meetings. (Doc. 52, Attach. 3 at 37; 43-44; 47; 69.) The Court also notes that Plaintiff testified in her deposition that she did not tell Defendant McGowan that she could not type her notes because of her hand, only that she had a hard

time typing the notes. (Id. at 47.) Simply put, while Defendant McGowan may have had knowledge of Plaintiff's issues transcribing notes, there is no evidence in the record that Plaintiff ever directly asked Defendant McGowan for the "specifically identified" accommodations listed in Plaintiff's response brief or otherwise informed Defendant McGowan of how she would need to be accommodated to manage her workload and comply with the new directives.

### 2. Discriminatory Termination

Defendants argue that they are entitled to summary judgment on Plaintiff's ADAAA and Rehabilitation Act claims because Plaintiff cannot establish that the December 4, 2015 written reprimand or her subsequent dismissal on December 17, 2015 was based on any actual, perceived or record of a disability. (Doc. 45, Attach. 1 at 8.) Defendants argue that Plaintiff cannot establish a prima facie case of disability discrimination because she cannot establish that her employer regarded her as disabled. (Id. at 9.) In addition, Defendants maintains that Plaintiff cannot show that the legitimate, non-discriminatory reasons for its employment decisions were mere pretext for discrimination. (Id. at 11-16.)

In response, Plaintiff claims that Defendants do not dispute that Plaintiff is, or was at the time of her employment, a qualified individual with a disability. (Doc. 52, Attach. 2 at 7.) Additionally, Plaintiff argues that there is evidence that

Defendants had knowledge of Plaintiff's impairment. (Id. at 10.) Finally, Plaintiff simultaneously contends that Defendants' alleged legitimate non-discriminatory reasons for the employment decisions fail to provide Plaintiff with a full and fair opportunity to demonstrate pretext (Id. at 14-15), and that Defendants' alleged legitimate non-discriminatory reasons for the employment decisions were pretext for disability discrimination (Id. at 14-23).

The ADA prohibits discrimination by an employer "against a qualified individual on the basis of a disability" in any of the "terms, conditions, [or] privileges of employment."[3] 42 U.S.C. § 12112(a). In the absence of direct evidence, Plaintiff must establish a prima facie case of disability discrimination utilizing the familiar burden shifting framework found in McDonnell Douglas v. Green, 411 U.S. 792, 802-04 (1973). "To establish a prima facie case of employment discrimination under the ADA, a plaintiff must show that, at the time of the adverse employment action, he had a disability, he was a qualified individual, and he was subjected to unlawful discrimination because of his disability." Mazzeo, 746 F.3d at 1268 (citing Holly

---

[3] Congress made significant changes to the ADA by enacting the ADA Amendments Act of 2008 (the "ADAAA"), Pub. L. No. 110-325, 122 Stat. 3553, which became effective on January 1, 2009. Because the critical events in this case took place after the ADAAA went into effect, we apply the post-ADAAA version of the ADA. Mazzeo, 746 F.3d at 1267.

v. Clairson Indus., L.L.C., 492 F.3d 1247, 1255–56 (11th Cir. 2007)).[4] "The ADA defines the term 'disability' as (1) a physical or mental impairment that "substantially limits one or more' of an individual's 'major life activities,' (2) a 'record of such an impairment,' or (3) 'being regarded as having such an impairment' as described in subsection (1)." Id. (citing 42 U.S.C. § 12102(1)). Should Plaintiff establish a prima facie case, the defendant then bears the burden of producing a legitimate, non-discriminatory reason for the adverse action. Woodruff v. Sch. Bd. of Seminole Cty., Fla., 304 F. App'x 795, 797 (11th Cir. 2008) (citing to Cleveland v. Home Shopping Network, Inc., 369 F.3d 1189, 1193 (11th Cir. 2004)). If the defendant meets this burden, the plaintiff must then point to evidence that the proffered reason is merely pretextual. Id.

In her complaint, Plaintiff alleges that she is disabled under all three definitions. (Doc. 32 at 19-23.) In their motion for summary judgment, Defendants state that "for the purposes of this motion only, Defendants will assume that Plaintiff has a physical or mental impairment that substantially limits one or more of her

---

[4] The standard for determining liability under the Rehabilitation Act is the same as that under the ADA and cases involving the ADA are precedent for those involving the Rehabilitation Act. Morales v. Georgia Dep't of Human Res., Dep't of Human Res., Div. of Family & Children Servs., 446 F. App'x 179, 182 (11th Cir. 2011); Shannon v. Postmaster Gen. of U.S. Postal Serv., 335 F. App'x 21, 25 (11th Cir. 2009).

major life activities and a record of such an impairment." (Doc. 45, Attach. 1 at 9.) However, Defendants argue that Plaintiff cannot show that her employer regarded her as disabled. (Id. at 10.) Thus, Defendants only challenge Plaintiff's ability to show she was disabled under the "regarded as" basis. Because Defendants "assume that Plaintiff has a physical or mental impairment that substantially limits one or more of her major life activities and a record of such an impairment," for the purposes of the motion, this Court will not grant summary judgment to Defendants on the grounds that Plaintiff has failed to meet her burden to show that she had a disability.

However, Defendants contend that even if Plaintiff is able to establish a prima facie case, they are still entitled to summary judgment because they have met their burden to articulate legitimate, non-discriminatory business reasons for their actions and Plaintiff cannot show that those reasons are pretextual. (Doc. 45, Attach. 1 at 11-16.) Defendants cite to the events leading up to and culminating in the written reprimand issued on December 4, 2015, namely Plaintiff's failure to follow the newly implemented changes in the intake process, recordkeeping, and documentation standards, failure to follow leave procedures, and her poor judgment in communicating with others, as well as events that occurred after the December 4, 2015 written reprimand. (Doc. 45, Attach. 1 at 11.)

Before being issued a written reprimand, Plaintiff's charts were audited by Defendant McGowan on November 25, 2015 (Doc. 52, Attach. 1 at ¶ 14), which resulted in Defendant McGowan informing Plaintiff on November 30, 2015, that she found Plaintiff's charts non-compliant and asking Plaintiff to bring her files into compliance by December 3, 2015. (Doc. 32 at 13; Doc. 52, Attach. 1 at ¶ 14.) Additionally, on November 25, 2015, Defendant McGowan e-mailed Lewis regarding Plaintiff's work performance and stated that after reviewing charts and documentation, she was planning on writing Plaintiff up and that she would like to discuss the course of action with Human Resources. (Doc. 52, Attach. 1 at ¶ 23; Doc. 52, Attach. 4 at 111.) Defendant McGowan followed up with Lewis on November 30, 2015, about Defendant McGowan's intent to write Plaintiff up (Doc. 45, Attach. 10 at 58), and met with Stepherson and Carroll on December 1, 2015, regarding Plaintiff's performance issues (Doc. 52, Attach. 1 at ¶ 26). Then, on December 4, 2015, Defendant McGowan issued a written reprimand to Plaintiff due to "negligence in adhering to clinical documentation and record keeping standards." (Doc. 45, Attach. 10 at 59.) The written reprimand stated that during the audit of charts on November 25, 2015, Defendant McGowan found "34 counts of neglect, complete absence of a clinical progress note for provided services, was found over 28 charts between 8/31/2015 and 11/17/2015." (Id.) Other issues were found in the audit, including one chart missing a

30

record of consent to treat, seven charts lacking the requiring documentation for referral of a student for a psychiatric evaluation, and general disorganization of the charts. (Id.)

After the written reprimand, on Monday, December 7, 2015, Defendant McGowan e-mailed Plaintiff about "the tracking" that was originally due the previous Friday at 5 p.m. and of which Plaintiff was given an extension until Monday at lunch. (Doc. 45, Attach. 10 at 61.) The e-mail goes on to state that "at 5pm today you informed me that you will not have it until 8 pm. I have accepted 2 requests for changed deadlines from the original. I am setting the final deadline for this task on Wed Dec 9 by noon." (Id.) A few days later, on December 10, 2015, Defendant McGowan e-mailed Plaintiff and stated that the November tracking was not completed accurately and requested Plaintiff revise and resubmit the form no later than December 16, 2015 at 5 p.m. (Id. at 62.) Also on December 15, 2015, Defendant McGowan e-mailed Stepherson and stated that the following issues arose since Defendant McGowan provided the written reprimand to Plaintiff: (1) Plaintiff, during an interview with a candidate on December 7, 2015, asked about the age of the child of the interviewee, (2) Plaintiff required numerous deadline extensions to complete work, (3) Plaintiff allegedly misconstrued statements in a candidate evaluation form, (4) Plaintiff left work without notice on December 15, 2015 and was unable to be contacted by Defendant McGowan on three attempts, (5) after chart audits on

December 7, 2015, Defendant McGowan had ethical concerns about Plaintiff's interactions with students and, during a follow-up discussion, Plaintiff expressed an intent to not see students for care because it was stressful, and (6) Plaintiff left the office early on December 7, 2015 and did not enter the time in ADP and left a scheduled student waiting for an appointment. (Doc. 52, Attach. 6 at 28.)

Plaintiff argues that many of these reasons are just "vague and indeterminable transgressions," and that the true reasons for termination are identified in the "script" prepared by Carroll, the HR Director, for use by Defendant McGowan during Plaintiff's termination. (Doc. 52, Attach. 2 at 17-22.) The Court disagrees. Defendants have cited to numerous instances that culminated in the decision to ask Plaintiff to resign in lieu of termination. (Doc. 45, Attach. 1 at 11-14.) Moreover, as Plaintiff admits, there are five explicitly listed reasons in the "script" that lead to the employment decision. (Doc. 52, Attach. 2 at 17-22.) Therefore, the Court finds that Defendants have stated legitimate, non-discriminatory reasons to terminate Plaintiff. Plaintiff must now demonstrate that these reasons were merely pretext for discriminating against her due to her disability.

To establish pretext pursuant to the burden-shifting analysis, " 'plaintiffs must point to "such weaknesses, implausibilities, inconsistencies, incoherencies or

contradictions in [defendants'] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence.' " Boatwright v. Aspen Prod., Inc., No. 5:17-CV-34(MTT), 2018 WL 3028944, at *5 (M.D. Ga. June 18, 2018) (quoting Springer v. Convergys Customer Mgmt. Grp., Inc., 509 F.3d 1344, 1348-49 (11th Cir. 2007)). "If the proffered reason is one that might motivate a reasonable employer," plaintiffs "must meet [that reason] head on and rebut it," rather than disputing the wisdom of the employer's reasoning. Id. (quotation marks and citation omitted). However, " '[a] reason is not pretext for discrimination unless it is shown both that the reason was false, and that discrimination was the real reason.' " Cappetta v. N. Fulton Eye Ctr., No. 1:15-CV-3412-LMM-JSA, 2017 WL 5197207, at *13 (N.D. Ga. Feb. 1, 2017), report and recommendation adopted sub nom. Capetta v. N. Fulton Eye Ctr., No. 1:15-CV-3412-LMM-JSA, 2017 WL 5443877 (N.D. Ga. Mar. 7, 2017), aff'd sub nom. Cappetta v. N. Fulton Eye Ctr., 713 F. App'x 940 (11th Cir. 2017) (quoting Brooks v. Cty. Comm. of Jefferson Cty., Ala., 446 F.3d 1160, 1163 (11th Cir. 2006)). "A plaintiff must present evidence that employer did not sincerely believe that the incident occurred. For example, a plaintiff may challenge the employer's sincere belief by disputing the employer's testimony regarding events within the employer's personal knowledge." Woodruff, 304 F. App'x at 798. Claims under Section 504 are subject to the same legal framework

as ADA claims. Wilbourne v. Forsyth Cty. Sch. Dist., 306 F. App'x 473, 476 (11th Cir. 2009). "In order to avoid summary judgment, a plaintiff must produce sufficient evidence for a reasonable factfinder to conclude that each of the employer's proffered nondiscriminatory reasons is pretextual." Chapman v. AI Transp., 229 F.3d 1012, 1037 (11th Cir. 2000).

Plaintiff first encourages this Court to view the "pretextual evidence" through the lens of evidence that Defendant McGowan is burdened by an animus toward disabled individuals. (Doc. 52, Attach. 2 at 15.) Plaintiff cites to two statements made by Defendant McGowan to Plaintiff that she should "find another job" as evidence that Defendant McGowan had a discriminatory animus. (Id.) The Court disagrees. These statements may indicate that Plaintiff and Defendant McGowan did not have a good working relationship, however, nothing in the statements indicate that Defendant McGowan held a discriminatory animus towards Plaintiff due to her disability or impairment.

First, the Court notes that the initial alleged statement by Defendant McGowan to "find another job," is supported by a citation to Plaintiff's deposition. In that deposition cite, the statement is simply reading Plaintiff's charge of discrimination to the EEOC. (Doc. 52, Attach. 3 at 31.) Moreover, nothing in that quote indicates that Defendant McGowan's alleged statement to "find another job" was in direct response to Plaintiff telling Defendant

McGowan that her disability was causing her difficulties in meeting the new directives. (See Doc. 52, Attach. 9 at ¶ 29 ("In direct response to me informing Ms. McGowan of my difficulties in meeting the new directives in early September 2015, Ms. McGowan's immediate response was that I should "find another job" or "if you don't like it, find another job.").)

The same is true for the second alleged time that Defendant McGowan told Plaintiff to find another job. In this instance, Plaintiff told Defendant McGowan that she received periodic facet injections and Defendant McGowan told her to have her work done before she left the office to which Plaintiff stated that she would do the best she could. (Doc. 52, Attach. 9 at ¶ 42.) In response, Defendant McGowan allegedly told Plaintiff "if you don't like the way I run the counseling center, you can find another job." (Id.) The Court does not find that this conversation illuminates any discriminatory animus by Defendant McGowan. Defendant McGowan told Plaintiff to get her work done before leaving the office and stated that Plaintiff could get another job if Plaintiff did not like Defendant McGowan's rules or procedures. Likewise, there is no context for Defendant McGowan's alleged statement to Plaintiff that "you're supposed to be an experienced clinician, why can't you type?" Without evidence of the context of the statement, the Court does not find that the statement itself shows a discriminatory animus towards Plaintiff.

Plaintiff also points to an e-mail in which Plaintiff informed Defendant McGowan that she scheduled a doctor's appointment to establish reasonable accommodations and promised to "make the time up during the week." (Id. at 16.) In response, Defendant McGowan stated "[a]s office protocol notes, there is no flex time policy within the system so there is no opportunity to 'make the time up during the week,'" and informed Plaintiff that she needed to enter her leave and assumed that the leave would be vacation. (Id.) Again, the Court does not find that Defendant McGowan's statement shows a discriminatory animus towards Plaintiff. Defendant McGowan informed Plaintiff of office policy, e.g. that flex time was not permitted, and then mistakenly assumed that Plaintiff would use vacation leave in the ADP system. Defendant McGowan did not refuse to permit the leave or otherwise indicate to Plaintiff that she was not permitted or should not seek a doctor's appointment to establish accommodations.

Likewise, Plaintiff cites to other instances in which Defendant McGowan indicated or stated that she took leave into account when reviewing work performance as evidence of Defendant McGowan's discriminatory animus. The Court disagrees. In regards to the statement, "[c]oncerning work performance, as noted in the our [sic] department meeting, I do reflect back to all employees their time away from the office as a comprehensive evaluations," this statement was in an e-mail chain in which Defendant McGowan

informed Plaintiff that she needed to follow the process for scheduling time off and further instructed Plaintiff to inform Defendant McGowan of an absence first before sharing with other office staff. (Doc. 52, Attach. 18.) Plaintiff first brought up the work performance issue in her reply by stating "as you mentioned in our meeting on Monday, one of the factors you consider on my annual evaluation, I have provided you with proof of the medical issues." (Id.) In response, Defendant McGowan stated that "I do reflect back to all employees their time away from the office as a comprehensive evaluation. Each employee earns time and is able to use time. . . . There are many facets which an individual team member contributes and time away from the office can be an impact on the overall function of the UCC." (Id.) In the same e-mail, Defendant McGowan said

> [t]o clarify, I am asking for you to follow
> protocol when taking time off. I have not
> indicated that I needed verification of the
> reason you were away from the office nor have
> I denied your access to take time off. It is
> the **process** that I am asking you to follow.

(Id. (emphasis in original).) In this Court's view, nothing in this exchange indicates that Defendant McGowan held a discriminatory animus towards employees that used sick leave.

Finally, Plaintiff points to how Defendant McGowan allegedly treated Susan Carol, the administrative assistant at the UCC, to show that Defendant McGowan held a discriminatory animus. In her

declaration, Carol stated that she suffered an emotional breakdown that required her to take leave in December 2015 until February 2016 under the Family Medical Leave Act ("FMLA"). (Doc. 52, Attach. 11 at ¶ 15.) When she returned to work, Carol stated that Defendant McGowan had removed certain responsibilities from her and that she "knew [Defendant McGowan] did not want me back at work." (Id.) Carol further states that Defendant McGowan attempted to get her to apply for permanent disability. (Id. at ¶ 16.) However, notably, Carol stated that she never received a write-up for performance during her employment, either before or after Defendant McGowan became the Director. (Id. at ¶ 19.) Plaintiff contends that Defendant McGowan's treatment of Susan Carol demonstrates Defendant McGowan's discriminatory animus. The Court disagrees. Carol does not state that she suffered any adverse employment decision, much less one motivated by discrimination on the part of Defendant McGowan or Defendant BOR. In cases that have found this type of "me too" evidence belies a discriminatory animus, the employees all suffered similar adverse employment actions due to the protected class or protected conduct. See Moyes v. Keiser Sch., Inc., No. 4:09-CV-334-SPM/WCS, 2010 WL 3833959, at *7 (N.D. Fla. Sept. 28, 2010) (finding that the situations of three other employees who suffered adverse employment decisions, two of which were terminated like the plaintiff, after taking FMLA leave or informing the employer of his disabilities were so similar that

the evidence could not be ignored); Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1286 (11th Cir. 2008) (finding evidence from three other black employees who suffered retaliation after complaining of racial discrimination in the workplace was admissible to prove the intent to discriminate and retaliate). According to her declaration, Carol, at the most, had some of her responsibilities removed by Defendant McGowan. However, there is no claim or other evidence supporting the inference that the act was caused by Carol's FMLA leave or that it was motivated by Defendant McGowan's discriminatory animus.

Turning now to the evidence of pretext, Plaintiff seeks to rebut the five bullet points included on the "script" for termination. (Doc. 52, Attach. 2 at 18-23.) The five bullet points on the script are summarized as follows: (1) Plaintiff allegedly documented in a student's chart that she told the student that she was ordered to disclose case details and students' PII in a spreadsheet, (2) Plaintiff, during an interview, asked an inappropriate interview question, (3) Plaintiff told Defendant McGowan that she was too stressed to refer a student to Dr. Winders and that she was not going to do so anymore, (4) Plaintiff left a confidential chart in the receptionist area, open to the public, unattended and then inquired of its whereabouts two days later, and (5) Plaintiff did not follow office leave protocols on December

15, 2015, when she left within ten minutes of starting work without notice to Defendant McGowan. (Doc. 52, Attach. 7 at 35.)

As to the first and third bullet point, Plaintiff denies the allegations. (Doc. 52, Attach. 2 at 18-19.) As to the first bullet point, Plaintiff denies telling students that the UCC was not confidential, but does acknowledge that while she did not use the word confidential, she "basically said that their statistical information was being collected and that their-the notes that I was keeping regarding their treatment would be viewed by other treatment providers." (Doc. 52, Attach. 3 at 58.) With regards to the third bullet point, Plaintiff rebuts it by simply pointing to her own declaration in which she denies the allegations and claims that she told Defendant McGowan that she referred students with private health insurance to private providers, instead of Dr. Winders, because she felt those students could not suffer the delays in seeing Dr. Winders. (Doc. 52, Attach. 2 at 19.) Plaintiff contends that Defendant McGowan knew and understood this rationale. (Id.) The Court does not find Plaintiff's conclusory statements to be sufficient to demonstrate that these reasons were false and simply pretext for discrimination. At bottom, it appears that Plaintiff has only presented evidence that Defendant McGowan may have misunderstood Plaintiff's communications to students about confidentiality, as Plaintiff did admit that she discussed with students the fact that their information was being collected,

and misunderstood Plaintiff's rationale for referring students to private providers, instead of Dr. Winders. However, even if Plaintiff's declaration was sufficient to introduce a genuine issue of material fact as to these two proffered reasons, the Court finds below that Plaintiff fails to carry her burden with the other enumerated reasons by Defendant.

As to the second bullet point, Plaintiff admits that she asked a question about the age of a child and that asking a candidate a question about having children "might be inappropriate." (Doc. 52, Attach. 2 at 18.) Plaintiff, however, maintains that that her job description does not contain any responsibilities for hiring or interviewing candidates and that she did not violate any University policy by asking the age of the child. (Id. at 18-19.) Similarly, in response to bullet point four, Plaintiff admits that she briefly left a chart on the receptionist's desk. (Id. at 20.) However, Plaintiff's argument that this was pretext rests primarily on the argument that Susan Carol frequently left files on her desk for restroom breaks and Defendant McGowan was aware of the privacy issue. (Id.) The Court finds that these explanations or rebuttals are insufficient to demonstrate that these reasons were mere pretext. An employer may fire an employee "for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for a discriminatory reason." Nix v. WLCY Radio/Rahall Commc'ns, 738 F.2d 1181, 1187 (11th Cir.

1984), abrogated on other grounds by Lewis v. City of Union City, Georgia, 918 F.3d 1213 (11th Cir. 2019). As discussed above, Plaintiff has not shown that Defendant McGowan held discriminatory intent towards Plaintiff. Plaintiff primarily quarrels with Defendants' decision, but does not demonstrate that this reason was pretextual.

Finally, Plaintiff seeks to rebut the fifth bullet point by first pointing to her deposition testimony that she did, in fact, tell Defendant McGowan that she was leaving because she was sick and by arguing that the infraction, even if true, does not justify termination. (Doc. 52, Attach. 2 at 21.) In an e-mail from Defendant McGowan to Plaintiff at 8:56 a.m. that morning, Defendant stated that "I am concerned as to your whereabouts. You were in the office this morning at 8:15am and left shortly thereafter. Your calendar does not reflect anything other than students appointments (first appt at 9am) and I have not received any notice about you needing to leave. If I don't hear from you within the hour, I will try to contact you by cell." (Doc. 52, Attach. 3 at 196.) Defendant McGowan sent a follow-up e-mail at 9:15 a.m. stating "Your 9am appointment has been here waiting for the last 15 minutes. I am sending you a text message." (Id. at 197.) Plaintiff responded to Defendant McGowan at 4:58 p.m. that "I am sorry I must not have made it clear that I was leaving this morning when I walked by you" and stated that she went to the doctor and

would provide Defendant McGowan with the documentation. (Id. at 198.)

Plaintiff's argument is primarily that Defendant McGowan actually did know that she was leaving. This is insufficient to show pretext. "Evidence that an incident, relied upon by the employer, did not occur is not alone sufficient to show pretext. A plaintiff must present evidence that employer did not sincerely believe that the incident occurred. For example, a plaintiff may challenge the employer's sincere belief by disputing the employer's testimony regarding events within the employer's personal knowledge." Woodruff, 304 F. App'x at 798. Here, there are contemporaneous e-mails from Defendant McGowan to Plaintiff stating that she did not know Plaintiff left and asking her about her whereabouts. Plaintiff has not presented evidence to challenge Defendant McGowan's sincere belief that Plaintiff left without informing her. Additionally, in the e-mail response, Plaintiff appears to admit that she may not have "made it clear" to Defendant McGowan that she was leaving for the day. Thus, Plaintiff has failed to show that this reason for termination was pretextual. "[A] plaintiff may not establish that an employer's proffered reason is pretextual merely by questioning the wisdom of the employer's reason," so long as "the reason is one that might motivate a reasonable employer." Combs v. Plantation Patterns, 106 F.3d 1519, 1543 (11th Cir. 1997).

Additionally, the Court finds that Plaintiff did not rebut the other reasons offered by Defendants in their brief—namely the continued poor performance by Plaintiff in meeting deadlines, refusing to follow newly implemented changes in the intake process, recordkeeping and documentation standards, and refusal to follow leave procedures. Plaintiff contends that the "multitude of reasons" offered now are evidence that Defendants' reasons for termination are unworthy of credence. The Court disagrees. These explanations were not manufactured after the termination and are supported by contemporaneous evidence in the record. Defendant McGowan sent e-mail to Stepherson on December 15, 2015 outlining numerous issues with Plaintiff's performance since the written reprimand (Doc. 52, Attach. 6 at 28), and Defendant McGowan met with Stepherson and Carroll on December 16, 2015, to discuss the same conduct that was sent in the e-mail to Stepherson (Doc. 52, Attach. 1 at ¶ 41).

Ultimately, considered together, the evidence presented by Plaintiff would not lead a reasonable finder of fact to question the truthfulness of Defendant's proffered legitimate, non-discriminatory reasons for requesting Plaintiff's resignation in lieu of termination. "A reason is not pretext for discrimination unless it is shown **both** that the reason was false, **and** that discrimination was the real reason." Brooks, 446 F.3d at 1163 (11th Cir. 2006) (emphasis in original) (quotation and citation

omitted). Even if some of the proffered reasons were based on erroneous facts, such as whether asking an interviewee the age of her child is, in fact, inappropriate or whether Plaintiff actually told students that she had to reveal confidential information, Plaintiff has not shown that Defendants did not sincerely hold beliefs that these actions were worthy of discipline. Defendant has offered numerous infractions that it believes Plaintiff committed that justified termination. Plaintiff has failed to meet her burden to show that these reasons were pretextual. Accordingly, Defendants are entitled to summary judgment on Plaintiff's claims of discrimination under the ADAAA and the Rehabilitation Act.

C. Plaintiff's Claims of Retaliation under the ADAAA and the Rehabilitation Act

In order to establish a prima facie case of retaliation, a plaintiff must show that: (1) she engaged in a statutorily protected expression; (2) she suffered an adverse employment action; and (3) there was a causal link between the adverse action and her protected expression. Frazier-White v. Gee, 818 F.3d 1249, 1258 (11th Cir. 2016).[5] The first element may be met by a request for a reasonable accommodation. Id. The third element requires a showing of "but-for" causation. Id.

---

[5] The Rehabilitation Act incorporates the anti-relation provision from the ADA. Burgos-Stefanelli v. Sec'y, U.S. Dep't of Homeland Sec., 410 F. App'x 243, 245 (11th Cir. 2011).

Defendants argue in their motion that Plaintiff cannot establish a retaliation claim under the ADAAA or the Rehabilitation Act because Plaintiff cannot show a causal link between the written reprimand and/or dismissal and Plaintiff's request for accommodation. (Doc. 45, Attach. 1 at 19.) In response, Plaintiff contends that Plaintiff's protected expression began "probably sometime in late September 2015" after Plaintiff informed Defendant McGowan that she was struggling to comply with the directives to type notes. (Doc. 52, Attach. 2 at 29.) As discussed above, the Court does not find that Plaintiff requested accommodations prior to December 1, 2015. Plaintiff further contends that Defendant McGowan certainly knew by December 1, 2015 of Plaintiff's request for an accommodation and was, therefore, aware of Plaintiff's protected activity. Plaintiff argues that the close temporal proximity between Plaintiff's request on December 1, 2015, and her forced resignation on December 17, 2015 is sufficient to create a genuine issue of material fact with respect to the third element—causation. (Id. at 30.)

The Court disagrees and finds that summary judgement should be granted to Defendants on Plaintiff's claims for retaliation. Plaintiff is correct that, in the Eleventh Circuit, "where a decision-maker becomes aware of protected conduct, a close temporal proximity between the decision-maker's acquisition of that knowledge and an adverse employment action will generally be

enough to create a factual issue on the causation element."
Singleton v. Pub. Health Tr. of Miami-Dade Cty., 725 F. App'x 736,
738 (11th Cir. 2018). However, where "as here, there is no other
evidence tending to show causation, the temporal proximity must be
'very close.' " Id. (quoting Thomas v. Cooper Lighting, Inc., 506
F.3d 1361, 1364 (11th Cir. 2007)). The rule of temporal proximity
is not absolute and can be overcome by evidence that shows that
the adverse employment action was due to other factors, such as
the plaintiff's performance. See Singleton, 725 F. App'x at 738
(citing cases and holding that there was no evidence to support
the plaintiff's claim that the adverse employment action was
motivated by his accommodations request and that the evidence
"overwhelmingly" indicates that the employment action was due to
the plaintiff's inability to perform his job); Wofsy v. Palmshores
Ret. Cmty., 285 F. App'x 631, 635 (11th Cir. 2008) (finding that
the plaintiff failed to establish a prima facie case of retaliation
where the plaintiff received warnings months before he made his
request for accommodation).

In this case, on November 25, 2015, Defendant McGowan
conducted an audit of the counselors' charts and e-mailed Lewis
about concerns that she had with Plaintiff's charts and stated her
intentions to write Plaintiff up. (Doc. 52, Attach. 1 at ¶ 23;
Doc. 52, Attach. 4 at 111.) On November 30, 2015, Defendant McGowan
informed Plaintiff that she found Plaintiff's charts non-compliant

and asked Plaintiff to bring her files into compliance by December 3, 2015. (Doc. 32 at 13; Doc. 52, Attach. 1 at ¶ 14.) On the same day, Defendant McGowan followed up with Lewis and informed him that she had a meeting scheduled for the following day, December 1, with Stepherson and Carroll to "review the numerous concerns I have pertaining to documentation of clinical work." (Doc. 45, Attach. 10 at 58.) Defendant McGowan goes on to include some of the issues with documentation that she found, including Plaintiff's lack of clinical documentation, failure to use the documentation standards that were established in August, and continuing insubordination issues. (Doc. 52, Attach. 1 at ¶ 25; Doc. 45, Attach. 10 at 58.) Accordingly, because Defendant McGowan intended to write Plaintiff up prior to becoming aware of Plaintiff's December 1, 2015 request for accommodations, the Court finds that Plaintiff has not established her prima facie case of retaliation as to the December 4, 2015 written reprimand. The Court also finds that Plaintiff has not established a prima facie case of retaliation with regards to the December 17, 2015 forced resignation. The written reprimand was issued to Plaintiff on December 4, 2015, and as discussed above, was contemplated and intended prior to Plaintiff's request for accommodations and Defendant McGowan's knowledge thereof. The written reprimand placed Plaintiff on notice that she could be terminated or subject to other actions for failure to comply with the directives therein.

However, even if the temporal proximity was sufficient to establish her prima facie case, Plaintiff has failed to show that Defendants' legitimate, non-retaliatory reasons for the adverse employment decisions were pretextual. See Wofsy, 285 F. App'x at 635; Satchel v. Sch. Bd. of Hillsborough Cty., 251 F. App'x 626, 629 (11th Cir. 2007). Accordingly, the Court finds that Defendants are entitled to summary judgment on Plaintiff's claims of retaliation under the ADAAA and the Rehabilitation Act.

III.   FIRST AMENDMENT CLAIM

Defendants also seek summary judgment on Plaintiff's 42 U.S.C. § 1983 claims. First, Defendants argue that Defendant BOR is not a "person" as defined by 42 U.S.C. § 1983, that Defendant BOR is entitled to Eleventh Amendment immunity as to the claims, that Defendant McGowan, in her official capacity, is entitled to Eleventh Amendment immunity, and that Defendant McGowan, in her individual capacity, is entitled to qualified immunity. (Doc. 45, Attach. 1 at 22-26.) Second, Defendants contend that Plaintiff's § 1983 claims fail on the merits. (Id. at 27-32.)

In response, Plaintiff concedes that Defendant BOR is not a "person" as defined by 42 U.S.C. § 1983, that Defendant BOR is entitled to Eleventh Amendment immunity as to the claims, and that Defendant McGowan, in her official capacity, is entitled to Eleventh Amendment immunity. (Doc. 52, Attach. 2 at 42.) However, Plaintiff argues that Defendant McGowan, in her individual

49

capacity, is not entitled to qualified immunity and that a reasonable jury could conclude that Plaintiff's employment was terminated for exercising her First Amendment right to free speech. (Id. at 33-42.) Accordingly, the Court will turn to the two remaining issues: whether Defendant McGowan is entitled to qualified immunity as to Plaintiff's § 1983 claims and, if not, whether these claims survive summary judgment.

A. Qualified Immunity as to Defendant McGowan

Qualified immunity " 'shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action.' " Echols v. Lawton, 913 F.3d 1313, 1319 (11th Cir. 2019), cert. denied, 139 S. Ct. 2678, 204 L. Ed. 2d 1070 (2019) (quoting Bailey v. Wheeler, 843 F.3d 473, 480 (11th Cir. 2016)). The government official must first establish that he was acting within the scope of his discretionary authority when the alleged wrongful act occurred. Id. If so, then the plaintiff must overcome qualified immunity by showing that (1) the defendant violated a constitutional right, and (2) the right was clearly established at the time the alleged conduct occurred. Id.

Plaintiff does not contend that Defendant McGowan was not acting within the scope of her discretionary authority when she terminated Plaintiff. (Doc. 52, Attach. 2 at 41.) Defendants contend that Plaintiff's speech was not protected by the First

Amendment, and therefore, Defendant McGowan did not violate any of Plaintiff's First Amendment rights. The Court must first determine whether Plaintiff has made out a violation of a constitutional right.

> "To state a claim for First Amendment retaliation, a plaintiff must allege that he engaged in protected speech, that the official's conduct adversely affected the protected speech, and that a causal connection exists between the speech and the official's retaliatory conduct."

Echols, 913 F.3d at 1320. For speech to be constitutionally protected in the employment context for public employees, "an employee must have spoken (1) as a citizen and (2) on a matter of public concern." Alves v. Bd. of Regents of the Univ. Sys. of Georgia, 804 F.3d 1149, 1160 (11th Cir. 2015). If the employee spoke as a citizen and on a matter of public concern, then the possibility of a First Amendment claim arises and the inquiry becomes one of balance; on the other hand, "if the employee spoke as an employee and on matters of personal interest, the First Amendment is not implicated, and the constitutional inquiry ends with no consideration of the Pickering test." Id. at 1160 (internal quotation and citations omitted). The Pickering test "requires balancing 'the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.' " McCabe v. Sharrett,

51

12 F.3d 1558, 1564 (11th Cir. 1994) (quoting <u>Pickering v. Board of Education</u>, 391 U.S. 563, 568, 88 S. Ct. 1731, 1734-35, 20 L. Ed. 2d 811 (1968)).

The Court finds that Plaintiff was speaking as an employee, not as a citizen, when she made her complaints. "When public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline." <u>Garcetti v. Ceballos</u>, 547 U.S. 410, 421, 126 S. Ct. 1951, 1960, 164 L. Ed. 2d 689 (2006). According to Plaintiff, she spoke as a citizen, not as an employee, because her speech raised concerns of: (1) "digitizing students' counseling records using an unencrypted platform of Microsoft Excel", (2) "gathering and insecurely storing certain personally identifying information and personal health information without students' written consent", and (3) Defendant McGowan "not having a license to practice social work in Georgia." (Doc. 52, Attach. 2 at 33-34.) To support her contention that this speech was as a citizen, Plaintiff points out that she did not complain up the chain of command by instead complaining to an ethics hotline and Dean Upton and that it was not her job responsibility to complain about threats of student privacy or threats to student safety arising out of an unlicensed counselor. (<u>Id.</u> at 36.)

The Court finds Alves to be persuasive to the facts at issue here. In Alves, a group of clinical psychologists submitted a written memorandum alleging mismanagement by their supervisor and other ethical concerns and were terminated in a purported reduction-in-force. 804 F.3d at 1153. The employee-appellants claimed that they were terminated in retaliation for submitting the memorandum as the memorandum constituted citizen speech on a matter of public concern, speech protected by the First Amendment. Id. The employee-appellants argued that their speech was made as citizens, not as employees, as their ordinary job duties did not include raising ethical issues, protesting their supervisor's incompetence, or critiquing the center's operations and, therefore, their memorandum was not made as employees but as citizens. The Eleventh Circuit rejected this argument and noted that "activities undertaken in course of performing one's job are activities undertaken 'pursuant to employment responsibilities.' " Id. at 1164 (quoting Garcetti, 547 U.S. at 422-24, 126 S. Ct. at 1960-61). The Eleventh Circuit found that as the employee-appellants raised their concerns during the course of performing, or attempting to perform, their ordinary roles as coordinators, psychologists, committee members, and supervisors, the speech was made as employees. Id. The main thrust of the memorandum was to correct their supervisor's perceived mismanagement.

Here, the three areas of speech that Plaintiff identifies are similar to the speech made in Alves—Plaintiff was seeking to perform her role as a counselor and sought to change the perceived mismanagement of the UCC by Defendant McGowan. Defendant McGowan required Plaintiff and other counselors to use an unencrypted Excel spreadsheet to record information, which Plaintiff felt was improper because it included personal information, and was allegedly "gathering and incorrectly storing" student information without their written consent. (Doc. 52, Attach. 2 at 34; Doc. 52, Attach. 3 at 126.) Despite Plaintiff's contention that it was not within her job responsibility to "complain about threats to student privacy or threats to student safety arising out of unlicensed counselors," the Court disagrees. First, Plaintiff's job duties include "maintain[ing] confidential records and complet[ing] all Counseling Center documentation within established time frames and according to established standards," and "provid[ing] mental health assessments and counseling for students." (Doc. 52, Attach. 3 at 110.) Thus, collecting and storing records about students and their treatment is well within Plaintiff's job duties. Plaintiff's complaints boil down to issues with how that information and data should be collected and stored, which are quintessential work-related complaints. Thus, while the subject matter, like in Alves, touches on areas that concern public safety, Plaintiff made the

complaints and speech in course of attempting to perform her duties.

Additionally, although Plaintiff contends that she did not complain "up the chain of command," Plaintiff states in her response to Defendant's motion for summary judgment that she did bring these concerns directly to Defendant McGowan, furthering this Court's perception that she was acting within her role as a counselor in addressing the perceived errors in the UCC's, and Defendant McGowan's, policies. The evidence also shows that Plaintiff addressed many of these objections to information security directly with Defendant McGowan before filing the ethics complaints. (See Doc. 52, Attach. 3 at 128 (Plaintiff e-mailed Defendant McGowan in September 2015 to explain her objection to the use of personally identifying information on jump or hard drives to which Defendant McGowan thanked her for her "diligence with IT security" and explained her own consult with others in the University about security, including the use of the unencrypted Excel spreadsheet).)

The Court is further persuaded that these communications were work-related when viewed in context. For example, in the first ethics hotline complaint, Plaintiff expressed concern about Defendant McGowan's idea to introduce fifteen-minute counseling sessions and Defendant McGowan's reduction of the lunch period to thirty minutes. (Doc. 52, Attach. 3 at 120-122.) This complaint,

in this Court's view, fits squarely in those communications made as an employee—not a citizen. Plaintiff complained about the shortening of her lunch period, which Defendant McGowan rescinded before it was addressed in the complaint, and a concern that the counseling sessions, which was within her duty as a counselor to provide, were too short.

The second ethics complaint, made on December 14, 2015, concerns a number of topics including: (1) a complaint of "workplace harassment" in which Plaintiff alleged that Defendant McGowan still required her to ask students' about their religion and sexual orientation, despite those questions being removed from the intake form; (2) a complaint regarding the use of a non-encrypted Excel sheet to store "sensitive personal and confidential health information" which "was gathered at [Defendant McGowan's] direction; (3) a complaint that "[Plaintiff] asked for reasonable accommodations on December 1, and was written up by [Defendant McGowan] on December 4;" and (4) a complaint that Defendant McGowan, at the time, did not hold a Georgia license to practice after Plaintiff heard Defendant McGowan state that she had never committed a student against their will after a suicide attempt. (Doc. 52, Attach. 3 at 123-127.) Again, on the whole of this communication, Plaintiff is asserting issues that she has with Defendant McGowan's policies and management of the UCC. Even with the issue of Defendant McGowan's licensure, Plaintiff stated

in the complaint that she researched the issue after Defendant McGowan discussed their policy of committing students against their will.

Arguably, the complaint that Defendant McGowan did not have a Georgia license for social work comes closest to being speech made as a citizen. However, Plaintiff's deposition testimony reveals that she made the complaint to protect herself from any potential liability at work. After hearing that a suicidal student was permitted to leave the UCC instead of being committed, Plaintiff performed a license search on Defendant McGowan and another counselor, Ruth Duran-Deffley, and found that neither possessed a current Georgia license at that time. (Doc. 2, Attach. 3 at 60.) When asked if Plaintiff told anyone that she conducted the search, she stated that she told her liability insurance carrier so she could "find out if there were any liability issues for me being the only licensed counselor in the Counseling Center." (Id.) The following exchange then occurred:

> Q: And what did they tell you?
> A: They told me as long as I have reported it, that I had no liability.
> Q: As long as you reported it to whom?
> A: Someone in the college.
> Q: So you found out that information on October 13; is that correct?
> A: Yes.
> Q: And then you went to Ms. Denny on October 14?
> A: Yes; as long as I notified someone in the college, yes.

(Id. at 61.) Even if this speech was made as a citizen, the Court finds that the speech was not made on a matter of public concern. "[W]hile speech that touch[es] upon a matter of public concern may be considered protected speech, our determination must be based on the record as a whole." Alves, 804 F.3d at 1166 (internal citations and quotation marks omitted). " '[T]he relevant inquiry is not whether the public would be **interested** in the topic of the speech at issue,' it is 'whether the **purpose** of [the employee's] speech was to raise issues of public concern.' " Id. at 1167 (quoting Maggio v. Sipple, 211 F.3d 1346, 1353 (11th Cir. 2000) (emphasis in original)).

In Alves, the employee-appellants argued that the memorandum was grounded in the public interest as it addressed the sufficiency of mental health services provided to students and because their supervisor's deficient management of the center affects the quality of services and jeopardizes the center's reputation. 804 F.3d at 1167. The Eleventh Circuit found that while the memorandum "may touch up against matters of public concern," it "is not directed to such concerns." Id. Specifically, the Eleventh Circuit found that the speech was not intended to address a matter of public concern but to "voic[e] their personal concerns" which happened to touch upon matters that might potentially affect the student body. Id. Here, Plaintiff's intent in raising the lack of licensure was not to address a matter of public concern from the

perspective of a citizen, but for her own benefit in protecting herself from liability. See, e.g., King v. Bd. of Cty. Commissioners, 916 F.3d 1339, 1349 (11th Cir. 2019) (finding the impetus for the speech to be, at bottom, "frustration at work, not fear for public safety or the public purse," and that the plaintiff's complaints were work-related complaints).

Finally, while not dispositive, the Court notes that Plaintiff never addressed or raised any of these concerns outside the workplace. King, 916 F.3d at 1349 (finding that the in-house nature of the plaintiff's speech, combined with other aspects, "reinforces that she was an employee discussing employment-related matters, not a private citizen engaging in protected speech"); Alves, 804 F.3d at 1168 (noting that, while not dispositive, the fact that the issues were raised, discussed, investigated, and resolved privately, with no outside intervention, supports a finding that the communication was a private employee grievance).

For the reasons stated above, the Court finds that Plaintiff's speech was not protected pursuant to the First Amendment and Defendant McGowan is entitled to qualified immunity as that Plaintiff has not made out a violation of a constitutional right. The Court also finds that Plaintiff has not met her burden to rebut the legitimate, non-retaliatory reasons for termination offered by Defendants. As discussed above, Defendants have put forth non-discriminatory and non-retaliatory reasons for terminating

Plaintiff. <u>See</u> supra Part II(B)(2). Defendants have shown that they would have terminated Plaintiff even in the absence of any protected speech. <u>VanDeWalle v. Leon Cty. Fla.</u>, 661 F. App'x 581, 587 (11th Cir. 2016). Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's 42 U.S.C. § 1983 claims should be granted.

### CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment (Doc. 45) is **GRANTED**. Defendants' Motion to Strike or in the Alternative Notice of Objection (Doc. 65) is **DENIED**. The Clerk of Court is **DIRECTED** to close this case.

SO ORDERED this _13th_ day of November 2019.

WILLIAM T. MOORE, JR.
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA